**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**NO. 3:10-CV-125**

DEVOID TURNER, TAMMY LOU
FONTENOT, as Administratrix of the Estate of
DARRYL WAYNE TURNER, deceased,

        Plaintiffs,

    v.

TASER INTERNATIONAL, INC.,

        Defendant.

---

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Scott D. MacLatchie (Bar No. 22824)
WOMBLE, CARLYLE, SANDRIDGE
  & RICE
301 South College Street, Suite 3500
Charlotte, North Carolina  28202
Telephone:    (704) 331-4942
Email:        SMacLatchie@wcsr.com

John R. Maley, *Pro Hac Vice*
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana  46204
Telephone:    (317) 231-7464
Email:        jmaley@btlaw.com

Attorneys for Defendant
TASER International, In

**TABLE OF CONTENTS**

I.      INTRODUCTION AND EXECUTIVE SUMMARY ....................................................... 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS.................................................. 4

        A.    The Parties      ........................................................................................................... 4

              1.    Darryl Turner........................................................................................... 4

              2.    TASER International, Inc................................................................................ 5

        B.    The TASER X26™ ECD ...................................................................................... 6

        C.    Peer-Reviewed Scientific And Medical Research Does Not Conclude
              That TASER X26 ECDs Cause VF In Humans ....................................................... 7

        D.    CMPD Acquires TASER X26 ECDs And CMPD Trains Its
              Police Force      ..................................................................................................... 10

        E.    TASER Warnings ................................................................................................. 11

        F.    The Incident Of March 20, 2008: Turner Commits Multiple Crimes
              At Food Lion Requiring Police Intervention And Use Of Force ......................... 17

        G.    Autopsy Results And Cause Of Death.................................................................. 19

        H.    CMPD's Suspension Of Officer For Prolonged Duration X26 ECD
              Application       ..................................................................................................... 20

        I.    Plaintiffs' Claims ................................................................................................. 20

III.    LEGAL STANDARDS ................................................................................................... 21

IV.     DISCUSSION: TASER IS ENTITLED TO SUMMARY JUDGMENT ON
        MULTIPLE, SEPARATE INDEPENDENT GROUNDS................................................ 22

        A.    The Claims Fail Because The Warnings Were Not Defective ............................... 22

              1.    TASER Repeatedly Warned Against Prolonged Extended
                    ECD Applications.......................................................................................... 22

              2.    TASER Neither Knew Nor Should Have Known Of An
                    Unreasonably Dangerous Condition In Its ECD
                    Or Warnings ................................................................................................ 23

        B.    The Claims Fail Because There Is No Evidence That Different
              Warnings Would Have Resulted In A Different Outcome..................................... 24

i

C.   The Claims Are Barred By Product Use Contrary To Warnings ........................... 26

D.   The Claims Are Barred By Decedent's Contributory Negligence ......................... 27

E.   The Claims Fail As A Matter Of General Causation: It Was Not Established At The Time Of Sale, Use, Or Even Today That An ECD Causes VF In Humans ....................................................................................... 30

F.   Only The Personal Representative Has Standing ..................................................... 34

G.   The Claim For Punitive Damages Fails ..................................................................... 34

IV.   CONCLUSION   ............................................................................................................. 35

Certificate of Service   .......................................................................................................... 35

ii

# TABLE OF AUTHORITIES

**Cases**

*In re Agent Orange Prod. Liab. Lit.,*
611 F.Supp. 1223 (E.D. N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987) .............................. 33

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ............................................................................................... 21

*In re Bausch & Lomb,*
693 F.Supp.2d 515 (D. S.C. 2010) ...................................................................................30, 31

*Braswell v. N.C. A&T State Univ.,*
168 S.E.2d 24 (N.C. Ct. App. 1969) ................................................................................... 29

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................... 21

*Champs Conven. Stores, Inc. v. United Chemical Co.,*
392 S.E.2d 761 (N.C. App. 1990) ....................................................................................... 28

*City of Canton v. Harris,*
489 U.S. 378 (1989) ............................................................................................... 21

*Cockerham v. Ward,*
262 S.E.2d 651 (N.C. Ct. App. 1980) ................................................................................. 22

*Couick v. Wyeth, Inc.,*
691 F.Supp.2d 643 (W.D. N.C. 2010) (Conrad, J.) ............................................................. 21

*Culler v. Harmlett,*
559 S.E.2d 195 (N.C. Ct. App. 2002) ..............................................................................28, 30

*DeWitt v. Eveready Battery Co.,*
550 S.E.2d 511 (N.C. Ct. App. 2001) ..............................................................................25, 28

*DeWitt v. Eveready Battery Co.,*
565 S.E.2d 140 (N.C. 2002) ............................................................................................... 21

*Diorio v. Penny,*
405 S.E.2d 789 (N.C. Ct. App. 1991) ................................................................................. 30

*Doe v. Ortho-Clinical Diagnostics, Inc.,*
440 F.Supp.2d 465 (M.D. N.C. 2006) ...............................................................30, 31, 32, 34

*Driggers v. Sofamor, S. N.C.,*
44 F.Supp.2d 760 (M.D. N.C. 1998) ................................................................................... 30

iii

*Dunn v. Sandoz Pharms. Corp.*,
  275 F.Supp.2d 672 (M.D. N.C. 2003) .......................................................... 30, 31, 32, 33, 34

*Durkee v. C. H. Robinson Worldwide, Inc.*,
  2011 U.S. Dist. LEXIS 9254 (W.D. N.C. 2011) .................................................................... 26

*Edwards v. Atro Spa*,
  891 F.Supp. 1074 (E.D. N.C. 1995) ................................................................................25, 34

*Emmett v. Johnson*,
  532 F.3d 291 (4th Cir. 2008) .................................................................................................. 25

*Evans v. Evans*,
  569 S.E.2d 303 (N.C. Ct. App. 2002) .................................................................................... 25

*Goodman v. Wenco Foods, Inc.*,
  423 S.E.2d 444 (N.C. 1992) ...................................................................................... 26, 29, 30

*Graves v. Welborn*,
  133 S.E.2d 761 (1963) ............................................................................................................ 34

*Hairston v. Alexander Tank and Equip.*,
  311 S.E.2d 559 (N.C. 1984) ................................................................................................... 28

*Higgins v. E.I. Du Pont de Nemours Co.*,
  863 F.2d 1162 (4th Cir. 1988) ..........................................................................................22, 23

*Hinton v. City of Raleigh*,
  264 S.E.2d 777 (N.C. Ct. App. 1980) .................................................................................... 29

*Indemnity Ins. Co. v. American Euercopter LLC*,
  2005 U.S. Dist. LEXIS 34011 (M.D. N.C. 2005) .................................................................. 27

*Jenkins v. Helgren*,
  217 S.E.2d 120 (N.C.. App. 1975) ......................................................................................... 23

*Jones v. Owens-Corning Fiberglass Corp.*,
  69 F.3d 712 (4th Cir. 1995) .................................................................................................... 28

*Kelley v. American Heyer-Schulte Corp.*,
  957 F.Supp. 873 (W.D. Tex. 1997) ........................................................................................ 31

*Kientz v. Carlton*,
  96 S.E.2d 14 (1957)         ........................................................................................................ 23

*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010) ................................................................................. 30, 31, 34

iv

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ............................................................31, 34

*Lashlee v. White Consol. Indus., Inc.*,
    548 S.E.2d 821 (N.C. App. 2001) ...............................................28-29, 34

*Lee v. Metropolitan Gov. of Nashville*,
    596 F.Supp.2d 1101 (M.D. Tenn. 2009) ................................ 21, 22, 25

*Lee v. TASER*,
    No. 3:06-cv-00108 (M.D. Tenn. 2009) ............................................... 4

*Lienhart v. Dryvit Systems, Inc.*,
    255 F.3d 138 (4th Cir. 2001) ..........................................................27, 28

*Lomax v. TASER*,
    No. 2:05-cv-01464 (D. Nev. Sep. 9, 2008) ......................................... 4

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005).................................................31-32, 34

*Marquez v. City of Phoenix*,
    2010 U.S. Dist. LEXIS 88545 (D. Ariz. 2010) ............................... 22

*Marquez v. TASER*,
    No. 2:08-cv-1132 (D. Ariz. 2010) ....................................................... 4

*Miller v. Miller*,
    160 S.E.2d 65 (N.C. 1968) ................................................................ 28

*Mills v. Coach Crafters, Inc.*,
    1996 U.S. Dist. LEXIS 14632 (M.D. N.C. 1996) ........................ 23-24

*Morgan v. Cavalier Acquisition Corp.*,
    432 S.E.2d 915 (N.C. Ct. App. 1993) ............................................... 21

*Nicholson v. American Safety Utility Corp.*,
    488 S.E.2d 240 (N.C. 1997) ...................................................27, 28, 30

*Norris v. Baxter Healthcare Corp.*,
    397 F.3d 878 (10th Cir. 2005)..........................................................32, 33

*In Re Panacryl Sutures Prods. Liab. Cases*,
    263 F.R.D. 312 (E.D. N.C. 2009) ...................................................... 31

*Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.*,
    530 S.E.2d 321 (N.C. Ct. App. 2000) ..........................................21-22, 23

v

*Ricci v. DeStefano,*
  129 S.Ct. 2658, 577 U.S. __ (2009) ...................................................................................... 21

*Richardson v. General Motors Corp.,*
  223 F.Supp.2d 753 (M.D. N.C. 2002) ................................................................................... 25

*Rosa v. TASER,*
  675 F.Supp.2d 1006 (N.D. Cal. 2009) ................................................................................. 4, 24

*Rutigliano v. Valley Business Forms,*
  929 F.Supp. 779 (D. N.J. 1996) ............................................................................................. 33

*Sakaria v. Trans World Airlines,*
  8 F.3d 164 (4th Cir. 1993) ..................................................................................................... 33

*Sawyer v. Food Lion, Inc.,*
  549 S.E.2d 867 (N.C. Ct. App. 2001) ................................................................................. 27, 28

*Scott v. Harris,*
  550 U.S. 372 (2007) .............................................................................................................. 29

*Smith v. Fiber Controls Corp.,*
  268 S.E.2d 504 (N.C. 1980) ................................................................................................... 28

*Smith v. General Motors Corp.,*
  376 F.Supp.2d 664 (W.D. Va. 2005) ...................................................................................... 31

*Estate of Smith v. General Motors Corp.,*
  179 Fed.Appx. 890 (4th Cir. 2006) ......................................................................................... 31

*Smith v. Wyeth-Ayerst Labs. Co.,*
  278 F.Supp.2d 684 (W.D. N.C. 2003) ........................................................................... 22, 24, 30

*Snoznik v. Jeld-Wen, Inc.,*
  2010 U.S. Dist. LEXIS 46814 (W.D. N.C. 2010) .................................................................... 25

*Sorensen v. Shaklee Corp.,*
  31 F.3d 638 (8th Cir. 1994) ................................................................................................... 33

*Travelers Ins. Co. v. Chrysler Corp.,*
  845 F.Supp. 1122 (M.D. N.C. 1994) ...................................................................................... 23

*Turpin v. Merrell Dow Pharms.,*
  959 F.2d 1349 (6th Cir. 1992) ............................................................................................... 33

*Westinghouse v. Hair,*
  418 S.E.2d 532 (N.C. Ct. App. 1992) .................................................................................... 34

vi

*Young v. Mashburn,*
180 S.E.2d 43 (N.C. Ct. App. 1971) .................................................... 34

## <u>Codes</u>

NCGS §1D-15(a) .................................................................... 34

NCGS §99B-1(3) .................................................................... 21

NCGS §99B-4 ...................................................................... 27

NCGS §99B-4(1) ................................................................26, 27

NCGS §99B-4(3) .................................................................... 30

NCGS ch. 99B (1995) .............................................................. 21

NCGS §99B-5(a) ...............................................................22, 24

NCGS §99B-5(a)(1) ................................................................ 23

NCGS §99B-5(a)(2) ................................................................ 23

NCPI—Civil §744.08 .............................................................. 26

## <u>Rules</u>

Federal Rule of Civil Procedure 56 ................................................ 21

Federal Rule of Evidence 407 ..................................................... 24

Federal Rule of Evidence 702 ..................................................... 23

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

A grocery employee, Mr. Darryl Turner, gets caught on video stealing merchandise, and is confronted by a loss-prevention investigator at work on March 20, 2008. Turner nonchalantly admits the thefts, is told that the decision about his employment will be made by management, and he takes his lunch break. Upon return as he clocks in, he is uncharacteristically disheveled with shirt out, a tooth "grill" in, and a lollipop in his mouth. Unbeknown then to store management, he also has illicit drugs (three baggies of marijuana) in his sock. A service manager tells him to clock out and get himself together, whereupon he says "Fuck you," and despite orders from her to leave he refuses. He enters the manager's area, uses the "F" word again, causes commotion in front of customers, loiters, publicly takes his shirt off to a tank top, is terminated, then remains in the store waiting for the manager. Meanwhile, police are called because of his behavior and trespassing.

When the manager arrives several minutes later and tends to customers, Turner, a 17-year-old high school graduate, confronts him and yells, "No, fuck that, nigger, you're gonna talk to me NOW!" The manager tells him to leave, but Turner continues his aggression, stating, "No, fuck you. You gonna come talk to me right now. Fuck this shit!" The manager again tells him to leave, but Turner comes closer in an aggressive manner like a challenge to fight, with Turner flexing his muscles, bouncing on his feet, saying, "Come on, come on!" Turner then flings a display rack towards the manager. The manager again orders him to leave, but he throws an umbrella at the manager, barely missing him as the manager covers his face, and aggressively comes towards the manager as seen on the store video (provided with this Brief) and the screenshots below:



Responding to the 911 call, Officer Dawson enters the store as this is transpiring and hears Turner say "Fuck you." Officer Dawson then sees Turner's aggressiveness towards the manager, witnesses Turner turn and say, "Fuck the Police," sees Turner throw something at the manager, and perceives that Turner is getting ready to hit the manager. Officer Dawson approaches, aims his TASER® X26™ Electronic Control Device (ECD), but Turner steps towards Officer Dawson (as cannot be disputed from the store video excerpts, provided with the Appendix) and Officer Dawson deploys his ECD in an attempt to restrain Turner. The ECD application is from a close distance, however, so the ECD probe spread – impacting to the right of Turner's sternum and down and to the right stomach area– does not result in incapacitation. Turner continues walking despite the ECD application, and Officer Dawson repeatedly tells him to go down but Turner refuses, and even goes to a checkout counter and throws a bag holder. Contrary to TASER's training and warning materials and CMPD policy, Officer Dawson continues the ECD application for 37 seconds and does not reassess the situation or consider redeployment or other force options. Turner remains upright and walking during most of that ECD application but ultimately collapses, apparently near the end of the 37 seconds at which point Officer Dawson ceases the application. Officer Dawson and another arriving CMPD Officer note that Turner is breathing and believe he is faking, so another 5-second ECD application is applied and Turner is handcuffed. The Charlotte Fire Department had already been contacted per CMPD policy, and when they arrive several minutes later they find Turner unresponsive. Unfortunately he is not resuscitated and is pronounced dead at the hospital.

The medical examiner performed an autopsy but unfortunately did not test for all drugs. The medical examiner – who admits that it is not established or generally accepted that TASER ECDs cause cardiac issues in humans, and who admits that he cannot say that the ECD contributed even 0.1% to Turner's death – determined the cause of death to be acute ventricular dysrhythmia, specifically ventricular fibrillation ("VF"). The medical examiner further found the death was precipitated by the agitated state and associated stress as well as use of a conducted energy weapon. His autopsy report quotes a National Institute of Justice ("NIJ") Interim Report published in June

2

2008 noting that "there is no conclusive medical evidence within the state of current research that indicates a high risk of serious injury or death from the direct effects of CED exposure."

Thereafter Turner's parents obtained a $625,000 settlement from the City of Charlotte, and now sue TASER International, the manufacturer of the ECD deployed by Officer Dawson, claiming that TASER's alleged "negligent training" resulted in Officer Dawson deploying the ECD into Turner's "chest" for 37 seconds, and that as a direct result of TASER's alleged negligent training, Turner died. Discovery, including depositions of various experts for both sides, has concluded, with a sharp dispute between the experts over the specific cause of Turner's death, with a defense cardiovascular pathologist from Harvard (the only such expert in the case) finding that Turner suffered from the pre-existing cardiac abnormality known as hypertrophic cardiomyopathy, a condition afflicting 1 in 500 and the leading cause of sudden cardiac arrest in people under 20 years of age. Beyond that specific causation battle, however, the material facts are undisputed, and Plaintiffs' claim against TASER fails as a matter of law on multiple independent fronts.

First, TASER's "training" is not actionable. As a manufacturer TASER has no duty to train independent law enforcement agencies like CMPD; training is the province of the agency, and in fact CMPD, not TASER, trained Officer Dawson. Moreover, the comprehensive training and warning materials provided by TASER to CMPD advised against prolonged ECD applications; indeed, that was the basis of the CMPD policy for which CMPD's Review Board disciplined Officer Dawson. Second, there is no record evidence that if different warnings had been provided by TASER, this unfortunate situation would have come out any differently. TASER repeatedly warned against extended duration applications, yet that is what occurred. TASER warned that for ineffective deployments such as this, the situation should be reassessed. Finally, Officer Dawson admitted that it would be speculation that he would have done anything differently with different warnings.

Third, Plaintiffs' claim is barred by the officer's misuse of the weapon, which is a complete statutory defense. TASER's materials repeatedly warned CMPD to avoid prolonged applications, and CMPD created its own policy for its officers. The CMPD Review Board expressly found that the officer's continued application of the weapon was improper under CMPD policy and disciplined

3

the officer with a five-day suspension. Fourth, the claim is barred by Turner's own contributory negligence, which is a complete statutory defense to the claim. Turner created the situation that required police intervention and force to be used. Indeed, he was negligent *per se* by committing multiple criminal acts including trespassing, assault, disorderly conduct, and resisting an officer.

Fifth, Plaintiffs' claims fail because as of March 20, 2008, the date of the incident, it was not established that ECDs cause VF in humans, so TASER was not required to warn of such an unproven risk. And, as a matter of general causation, it is not established even today that TASER ECDs cause VF in humans as Plaintiffs allege. Law lags science, and without that foundational scientific underpinning, a jury cannot be allowed to determine specific causation that this ECD caused this death. Finally, the claim for punitive damages fails as a matter of law.

Thus, as has occurred in other cases brought against TASER involving in-custody deaths, summary judgment is warranted. *See, e.g., Lee v. TASER*, No. 3:06-cv-00108 (M.D. Tenn. 2009); *Rosa v. TASER*, 675 F.Supp.2d 1006 (N.D. Cal. 2009); *Lomax v. TASER*, No. 2:05-cv-01464 (D. Nev. Sep. 9, 2008); *Marquez v. TASER*, No. 2:08-cv-1132 (D. Ariz. 2010) (copies in Appendix).

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

The material facts are undisputed, and taken favorably for the non-movant Plaintiffs are as follows.

### A. The Parties.

#### 1. Darryl Turner.

Darryl Turner was a part-time employee of a Food Lion grocery store in Charlotte, North Carolina. [Ex9p14] He was a high school graduate, and was 17 years old. [Ex9p18;Compl.¶13] His parents, Devoid Turner and Tammy Fontenot, are Plaintiffs in this action. [Compl.¶2] As previewed above and outlined in more detail in Part F of this Brief, Turner made a series of bad decisions that included commission of tortious and criminal acts ultimately leading to his fatal encounter with police on March 20, 2008.

### 2.    TASER International, Inc.

TASER was founded by brothers Rick Smith and Tom Smith, based on Rick's loss of two high school friends to a firearm. [Ex8¶3] With a mission of protecting life, TASER designs, assembles, and markets ECDs for police officers to protect themselves while reducing the risk of serious injury or death. [Ex8¶4] TASER is the world's leading manufacturer of ECDs. [Ex8¶4] TASER ECDs are used by more than 15,800 U.S. law enforcement agencies and in 40 countries. [Ex7¶43] An estimated 2.25 million individuals have been exposed to TASER ECDs. [Ex7¶43]

TASER has engaged in, funded, and supported substantial research regarding the safety of its products. [Ex8¶5] For instance, in 1995, TASER retained Dr. Robert A. Stratbucker, the leading medical/scientific expert on electrical weapons at the time, to conduct a complete electrical, medical, and scientific literature review and to conduct safety studies of the impulse generator module of the TASER ECD. [Ex8¶5] Dr. Stratbucker's experiments corroborated earlier findings in consulting reports and peer-reviewed journals that the electrical emission from electrical stun-type pulse generators delivered to the body surface did not cause serious cardiac rhythm abnormalities in the otherwise healthy adult swine heart. [Ex8¶5] TASER also retained Dr. Stratbucker to perform initial testing on the TASER ECD to determine if it posed a risk of VF. [Ex8¶6] Dr. Stratbucker and researchers at the University of Missouri conducted research using canine and later porcine (swine) models because swine are one of the easiest mammals in which to induce cardiac arrest or VF with electricity. [Ex8¶6] Swine hearts fibrillate more easily than human hearts. [Ex10p142;Ex3,p14] The researchers found that the electrical output of the TASER ECD had to be increased by a factor of 15 to cause VF in small swine. [Ex8¶6] The results of the early ECD testing were then subjected to peer review and published in *Pacing and Clinical Electrophysiology* ("PACE"), the journal of the International Cardiac Pacing and Electrophysiology Society. [Ex8¶7]

Dr. Stratbucker was then employed by TASER as its Medical Director for several years until his retirement. [Ex8¶9] After Dr. Stratbucker's retirement, that position has been held by Dr. Jeffrey Ho, one of the world's leading researchers on the effects of ECDs on humans. [Ex8¶9] Mark W. Kroll, Ph.D., a bioelectrical scientist, has served as a Director of TASER since January 2003.

[Ex8¶10] Dr. Kroll holds more patents on implantable cardiac devices than any other person in the world, bringing a uniquely qualified expertise to TASER – particularly on the topic of electricity and its effects on the heart. [Ex8¶10] Dr. Kroll is also a member of the TASER Scientific Medical Advisory Board ("SMAB"), created in 2004, and which also includes distinguished cardiologists, electrophysiologists, physicians, and a forensic pathologist. [Ex8¶10][1] Dr. Richard H. Carmona, former U.S. Surgeon General, has served as a Director of TASER since March 2007. [Ex8¶10]

As a manufacturer of law enforcement weapons to be used by officers, TASER can only provide warnings, instructions, and recommended training materials to its law enforcement customers. [Ex7¶22] TASER does not control the distribution, use, or modification of such materials by a law enforcement agency to its officers. [Ex7¶22] The agencies, not TASER, train their officers, determine the time, content, and requirements for such training, and develop and implement their own use-of-force policies. [Ex7¶22] To assist agencies, TASER started its certified instructor course in 1998, and provides recommended lesson plans to agencies, which are revised approximately annually. [Ex7¶¶23-24] Certified instructors are sent a CD or DVD with the latest materials as they are released. [Ex7¶24] Training Bulletins are periodically issued and emailed to certified instructors and then incorporated into the next CD/DVD. [Ex7¶25]

## B.    The TASER X26™ ECD.

Officer Dawson utilized a TASER X26 ECD with 9 millimeter ("mm") (0.35 inch) probes in his encounter with Turner. [Ex12pp65-66;Ex7¶¶9,13] This X26 ECD was purchased by CMPD and then shipped by TASER to CMPD in 2006. [Ex7¶9] TASER's April 2006 Product Warnings were shipped with this ECD, along with TASER's Training Version 12 and TASER's 2005 X26 ECD Operating Manual. [Ex7¶¶10-12] The power source for the TASER X26 ECD consists of two 3-volt cells similar to those used in consumer cameras. [Ex3p11] Electricity from ECD applications does not store up in the human body. [Ex7¶39] The X26 ECD works by transmitting stimuli

---

[1] Dr. Kroll chose to devote time to TASER because "I spent my whole life using electricity to save lives by coming up with better pacemakers, better defibrillators and I saw this as a unique opportunity to use electricity to save lives by reducing arrest-related deaths." [Ex11p194] He believes in the safety of TASER products and has even undergone an ECD application to the chest. [Ex11pp194-95]

6

through brief, low-charge, short-duration electrical pulses that block the control center of the body causing the target temporary incapacitation. [Ex7¶32] Although the X26 ECD produces an open-circuit peak voltage of 50,000 volts ("V"), the output voltage (and what actually enters, the body) is only approximately 1,400 – 2,520 V (the range of common static electricity shocks is approximately 100,000 V). [Ex7¶36;Ex3p10] Voltage is not a key measure of electrical safety. [Ex7¶37]

The X26 ECD trigger activates a 5-second cycle, which is stopped by placing the safety lever in the safe position. [Ex7¶33] Holding the trigger down continues the discharge beyond 5 seconds as a safety feature for the protection of the user because many people recover immediately from an ECD discharge upon conclusion of the cycle and could immediately continue violent actions if the ECD were to stop discharging without the user's intent. [Ex7¶33] TASER built into its X26 ECDs data download capabilities that record the date, time, and duration for each trigger pull. [Ex7¶34]

## C. Peer-Reviewed Scientific And Medical Research Does Not Conclude That TASER X26 ECDs Cause VF In Humans.

Plaintiffs' theory in this case is that the ECD current applied to Turner in an extended duration application of 37 seconds caused electrically induced VF. [Compl.;Ex13pp83-84] The peer-reviewed scientific and medical research, however, does not conclude that TASER X26 ECDs cause VF in humans. [*E.g.*,Ex3p13;Ex1p4;Ex2p5;Ex7¶¶50-51] As Dr. Owens, the Charlotte medical examiner who performed the Turner autopsy, confirms, "It has not been shown that the [TASER ECD] in and of itself can cause, I guess, capture or ventricular arrhythmia or whatever, a heart problem." [Ex10p125] Dr. Owens confirms that when undertaking to ascertain cause of death, one looks to the medical literature to look at what's established as potentially causal, and that if it's unknown in science and medicine one cannot speculate. [Ex10pp135-36] Dr. Owens further agrees that at the time of his Turner autopsy report in June of 2008, it was not generally accepted in the medical community that TASER ECDs can cause cardiac arrest in humans [Ex10p124], and there is no such general acceptance today. Dr. Owens admits that the "literature and all of the studies and everything that were out there at the time and since have not shown definitively that the current

7

from the [TASER ECD] in a human can cause the V-Fib." [Ex10p97] As Dr. Gary Vilke, one of the

leading researchers on the effects of ECDs on humans, states:

> TASER ECDs have been extensively researched. I have undertaken significant independent research on TASER ECDs, and am knowledgeable of peer-reviewed medical and scientific research on TASER ECDs conducted by others. … As of March 20, 2008 and today, no peer-reviewed published scientific or medical literature concluded that TASER ECDs cause ventricular fibrillation or cardiac dhysrhythmias in humans. Some studies under unique and unrealistic settings have been able to induce ventricular fibrillation or cardiac dysrhythmias in swine, but swine fibrillate more easily than humans, and those studies do not conclude that ECDs cause ventricular fibrillation in humans. There is no X26 ECD human study that has found, or even shown, a single incident of cardiac capture or negative cardiac effect.

[Ex3pp13-14]

Dr. Zipes, Plaintiffs' causation expert, admits that no published epidemiological papers on

TASER ECDs conclude that a TASER ECD application to a human caused death. [Ex13p69] He

further confirms that no electrophysiology journal has published any peer-reviewed article

concluding that ECDs cause VF in humans. [Ex13p80] ("Not yet. Not yet.") He further admits that

as of March 20, 2008, other than two anecdotes that appear as letters rather than peer-reviewed

research, as of the date of Turner's incident there was no peer-reviewed scientific or medical

literature that concluded that ECDs cause VF in humans. [Ex13pp77-78] ("Not in humans. In pigs,

well established.") Dr. Zipes further admits that even from human anecdote reports, there are no

reports where right-side of chest probe locations (as occurred with Turner) produced documented

VF in a human. [Ex13p38] Further, he confirms that in any cause of death certificates he has

completed, they would all reflect a known, established cause of death. [Ex13pp91-92]

The human research studies on potential ECD effects on humans are extensive and have

never produced VF, despite trans-cardiac vectors of the probes and extended durations up to 45

seconds.[2] Apparent cardiac capture, without injury, of a human heart has been documented in only

---

[2] *See, e.g.,* Ho, et al., The cardiovascular, respiratory, and metabolic effects of a long duration electronic control device exposure in human volunteers**,** *Forensic Sci Med Pathol.* 2010 Dec;6(4):268-74. Epub 2010 May 26 (30-second exposures on anterior thorax; no cardiac rhythm abnormalities) [Ex54]; Ho, et al, Echocardiographic evaluation of TASER X26 [ECD] probe deployment into the chests of human volunteers, *Am J Emerg Med.* 2010 Jan;28(1):49-55 (close-range chest shots; no cardiac capture) [Ex55]; Ho, et al, Echocardiographic Evaluation of a TASER-X26 [ECD] Application in the Ideal Human Cardiac Axis, *Acad*

Case 3:10-cv-00125-RJC-DCK   Document 34   Filed 02/25/11   Page 16 of 43

one study involving a *prototype* ECD in 2009 that was never released as a product. That prototype ECD was redesigned and retested on the same human subject with consent, and no subsequent cardiac capture occurred; the subject had a deformity known as pectus excavatum with undeveloped chest musculature.[3] The subject was not injured and did not go into VF at any time with any exposure, including with the prototype during the first exposure. [*Id.*]

The literature otherwise reports the utility of and cardiac safety of ECDs with humans. For instance:

- From a January 2011 paper: "Results: There were 140 articles on CEWs screened, and 20 appropriate articles were rigorously reviewed and recommendations given. These *studies did not report any evidence of* dangerous laboratory abnormalities, physiologic changes, or immediate or delayed *cardiac ischemia or dysrhythmias after exposure to CEW electrical discharges* of up to 15s."[4]

- From a 2009 letter following-up a prior paper: "When this experience is combined with previous reports of medical outcomes after consecutive field use of conducted electrical weapons, including Eastman et al (n 426), Bozeman et al (n 1201), and a recent abstract by Angelidis et al (n 1101), there is a combined experience of 4,058 consecutively monitored conducted electrical weapon uses with an electrical shock delivered.[2-4] Serious injuries are clearly rare, *and there are no cases in any of the reports suggesting sudden cardiac death related to the Taser.*"[5]

- From a 2010 paper from the International Association of Chiefs of Police: "Ninety-four [Electronic Control Weapon] (ECW) research papers were reviewed during the preparation of this document. Seven of these received financial support from a manufacturer. … *The totality of information presently available suggests that ECWs do not create an increased risk of pacemaker malfunction, heart fibrillation, or death* or serious injury, absent the legitimate concern of secondary injuries from falling down."[6]

- From a 2010 NIJ Final Report: "Across 12 agencies and more than 25,000 use of force cases, the odds of a suspect being injured decreased by 70 percent when a CED was used. Controlling for other types of force and resistance, the use of CEDs significantly reduced the probability of

---

*Emerg Med.* 2008 Aug 10 (10-second ECD exposures in an ideal cardiac axis application did not demonstrate concerning tachyarrhythmias using human models). [Ex56]

[3] The respiratory, metabolic, and neuroendocrine effects of a new generation electronic control device, Dawes DM, Ho JD, Reardon RF, et al. Forensic Sci Int. Sep 28 2010. [Ex47]

[4] Vilke GM, Bozeman WP, Chan TC. Emergency Department Evaluation after Conducted Energy Weapon Use: Review of the Literature for the Clinician. The Journal of Emergency Medicine. In Press, Corrected Proof. Position Paper Approved by the American Academy of Emergency Medicine Clinical Guidelines Committee (emphasis added). [Ex48]

[5] Bozeman, W P. Additional Information on TASER [ECD] safety. Annals of Emergency Medicine. November 2009. Vol. 54, No. 5 (emphasis added). [Ex49]

[6] Electronic Control Weapons, Concepts and Issues Paper, International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center, April 2010 (emphasis added). [Ex50]

injuries. In very rare cases, people have died after being pepper sprayed or shocked with a Taser, although *no clear evidence exists that the weapons themselves caused the deaths.*"[7]

- From a 2009 American Medical Association paper: "Most studies undertaken by law enforcement agencies (and others) indicate that deploying CEDs relative to other use-of-force options, such as pepper spray, physical force, police dogs, and batons, reduces injuries to officers and suspects and reduces the use of lethal force. If deployed according to an appropriate use-of-force policy, and used in conjunction with a medically driven quality assurance process, Taser use by law enforcement officers appears to be a safe and effective tool to place uncooperative or combative subjects into custody. … Furthermore*, no evidence of dysrhythmia or myocardial ischemia is apparent, even when the barbs are positioned on the thorax and cardiac apex.*"[8]

- From a 2009 article, "A rapidly evolving body of literature has examined a range of physiologic and cardiovascular effects of conducted electrical weapon exposure in human volunteers (Table 6). These studies, which include articles and published preliminary reports in abstract form, demonstrate no evidence of dangerous respiratory or metabolic effects using standard (5-second), prolonged (15-second), and extended (up to 45-second) conducted electrical weapon discharges."[9]

**D.    CMPD Acquires TASER X26 ECDs And CMPD Trains Its Police Force.**

CMPD, a large police agency with 1,000 patrol officers, first started consideration of acquiring and deploying ECDs in 2000. [Ex14pp7,14] CMPD researched products and the available material that existed at that time. [Ex14pp8-9] Based on that research, CMPD felt comfortable with the safety of ECDs. [Ex14p9] CMPD relied in part on information provided by TASER, including that TASER ECDs were cardiac safe. [Ex14pp9-10] CMPD first acquired TASER ECDs in 2002 as part of a CMPD pilot project. [Ex14p11] The results of that pilot were "very positive" with "situations where the taser was able to mitigate force as well as to get a person into custody as it was described to us." [Ex14p12] CMPD then purchased X26s initially in 2003. [Ex14pp12-13;Ex7¶9]

Training is the responsibility of CMPD, not TASER. [Ex7¶22] As CMPD rolled out its training to officers, it "opted to train division representatives so each patrol division would have instructors. The academy staff, the guys who were master instructors, trained them and then those

---

[7] Smith M, Kaminski R, Alpert G, Fridell L, MacDonald J, Kubu B. A Multi-Method Evaluation of Police Use of Force Outcomes: Final Report to the National Institute of Justice: US Department of Justice; 2010 (emphasis added). [Ex51]

[8] Carolyn B. Robinowitz, MD, Chair, Report 6 of the Council on Science and Public Health (A-09), Use of Tasers® [Conducted Electrical Devices (CEDs)] by Law Enforcement Agencies (Reference Committee D), American Medical Association (emphasis added). [Ex52]

[9] Bozeman W, II WH, Heck J, Graham D, Martin B, Winslow J. "Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officer Against Criminal Suspects," Annals of Emergency Medicine, January 2009. [Ex53]

divisions, patrol divisions, would come to the academy and they would all receive their training at one time." [Ex14p14;Ex59¶3] Officer Dawson was initially trained by CMPD in late 2003-early 2004, with CMPD using Version 10 of TASER's exemplar materials. [Ex14p15] His training was by CMPD officers, not TASER. [Ex12p16] TASER had no contract to train CMPD officers, and CMPD officers are not agents of TASER; TASER had no control over whether, when, or how CMPD trained. [Ex8¶12;Ex59¶4] Officers were trained then that ECD shots to the chest were no more dangerous than other areas, and that deployments exceeding 5 seconds did not increase cardiac risks. [Ex14p27] Under CMPD's use-of-force policy, an ECD can be used if there is a physical threat to the officer or another. [Ex14p41] Prior to and since the Turner incident, CMPD has not had any other temporal deaths involving a TASER ECD deployment. [Ex14pp44-45]

**E.     TASER Warnings.**

TASER provided CMPD with substantial warnings and training information prior to the March 20, 2008 incident. TASER provides a training CD/DVD, current warnings, and Operating Manual with every ECD, and instructors (such as CMPD Captain Campagna) receive these materials in instructor training. [Ex8¶11] When CMPD first purchased X26 ECDs in 2003, TASER provided its Version 10 materials. [Ex14pp15-16] As updates or new versions of these materials come out, or as new product information or training bulletins are issued, TASER forwards these materials to all TASER-certified instructors in its database. [Ex7¶25]

Version 12, including the April 12, 2006 product warnings and 2005 Operating Manual, was shipped to CMPD with the shipment of the X26 ECD used by Officer Dawson in this incident. [Ex7¶¶9-12] Subsequently, CMPD purchased additional X26 ECD kits in June 2006, and Version 13 was included with that shipment. [Ex7¶15] Then, in December 2007, CMPD purchased and received another set of X26 ECD kits, and shipped with those kits was Version 14, the 2007 X26 ECD Operating Manual, and the March 2007 Product Warnings. [Ex7¶16] CMPD received those Version 14 warning materials and began using them with its police force as early as January 2008 training at the Academy. [Ex24¶¶3-4]

11

Relevant to this situation, among the multiple warnings TASER provided to CMPD prior to this March 20, 2008 incident were the following. In Version 10 of its materials, provided back in 2003, at the outset of the course content, the following warning was provided:

**WARNINGS**

**WARNING: READ BEFORE USING**
The TASER X26 is a less-lethal weapon. It is designed to incapacitate a target from a safe distance without causing death or permanent injury. While the extensive medical evidence strongly supports the TASER X26 will not cause lasting aftereffects or fatality, it is important to remember that the very nature of physical confrontation involves a degree of risk that someone will get hurt or may even be killed due to unforeseen circumstances and individual susceptibilities. Accordingly, the TASER X26 should be treated as a serious weapon and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk. Law enforcement customers are deployment and tactical experts and will determine all deployment and tactical practices including where the TASER X26 fits in their respective use of force continuum.

[Ex33p2; similar warnings at ExsCp2 and Dp2 to Ex7]

In June 2005, TASER issued Training Bulletin No. 12 regarding continuous, repeated, or extended duration applications. [Ex14pp33-35;Ex40] When CMPD receives TASER bulletins, CMPD – not TASER – decides whether they impact CMPD policy and how CMPD wants to address them. [Ex14pp43-44] Here, CMPD's training officer reviewed TASER Bulletin 12 by October 2005, and he affirms that everyone in the department would have been reviewing it and acknowledging it around that time as well. [Ex14p34] TASER Training Bulletin 12 [Ex40] is a 3-page bulletin that provides in part:

**Subject: Restraint during TASER™ System Application**
TI training has long encouraged that device operators consider the TASER system application as a 5-second 'window of opportunity,' during which time an arrest team can begin restraint procedures. However, it has come to our attention that there may be a training issue where arrest teams are avoiding touching the subject during the TASER device application.

2.      Repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration, particularly when the probes are placed across the chest or diaphragm. ***Users should avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges whenever practicable*** in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period.

12

3.      Particularly when dealing with persons showing symptoms of excited delirium, use of the TASER system should be combined with physical restraint techniques to minimize the total duration of the struggle and minimize the total duration of TASER system stimulation. * * *

4.      * * * It is important, however, that the user focus on the TASER device induced impairment as a window of opportunity during which physical restraint procedures should be initiated whenever practicable.

5.      If circumstances preclude restraint procedures during TASER system application, such as a single officer acting alone: a. The user should attempt to minimize the uninterrupted duration and total number of TASER device applications . . . .

[Ex40p1] (emphasis added)

This June 2005 TASER Bulletin further provided in part:

7.      As with any use of force or restraint tool, technique or device, the use of a TASER device upon a person . . . may be stressful and contribute to exertion or exhaustion, including injury or death caused by an individual's exhaustion or over-exertion. Repeated, prolonged, and/or continuous TASER device exposure(s) may contribute to or cause cumulative exertion or exhaustion results or effects.

[Ex40p2]

After receiving TASER's 2005 extended duration bulletin, CMPD created its *own* internal

advisory document to CMPD officers that was sent to them through CMPD's learning management

system. [Ex14pp33-35;Ex42] This document was created back in the summer/fall of 2005, well

before the March 20, 2008, Turner incident. [Ex14pp33-35] (the document has a print date of

7/8/08 but it is undisputed that it was created in 2005, Ex14pp33-35). This CMPD Advisory

Document – still in effect at the time of the Turner incident and today – provides in part:

**TASER Tactical Update and In-Custody Death Review**
There are a few training issues that we need to cover with all of our TASER operators that have come up over the last year. Please read this document in its entirety.

**TASER Training Bulletin**
TASER International sent out a training update that deals with 'repeated, prolonged, and/or continuous exposure to the TASER.' Please read the following notes from the manufacturer and the tactical review just below it.

[Ex42p1] The CMPD Tactical Update then quoted several paragraphs from the TASER June 2005

Bulletin 12, including that "**Users should avoid prolonged, extended, uninterrupted discharges**

13

**or extensive multiple discharges whenever practicable** . . ." (emphasis added), and that
"Particularly when dealing with persons showing symptoms of excited delirium, use of the TASER
system should be combined with physical restraint techniques to *minimize the total duration of the struggle
and to minimize the total duration of TASER system stimulation*." [Ex42] (emphasis added) The CMPD
Update then provided, "It is important that officers immediately inform Medic personnel of any
symptoms exhibited by the suspect that are associated with Excited Delirium including any
indication that the suspect is under the influence of alcohol or drugs." [Ex42]

Beyond these substantial warnings – both from TASER and CMPD – addressing extended
duration applications, thereafter TASER provided CMPD with multiple additional warnings on
extended duration applications. For instance, TASER's September 28, 2005 4-page Product
Warnings document provides in part:

> Any use of force . . . carries with it risks of injury or even death. To minimize these
> risks:
>
> 8.      When practicable, **avoid prolonged or continuous exposure(s) to the
> TASER device electrical discharge**. The stress and exertion of extensive repeated,
> prolonged, or continuous application(s) of the TASER device may contribute to
> cumulative exhaustion, stress, and associated medical risk(s). Severe exhaustion
> and/or over-exertion from physical struggle, drug intoxication, use of restraint
> devices, etc. may result in serious injury or death. * * * If a person's system is already
> compromised by over-exertion, drug intoxication, stress, pre-existing medical or
> psychological condition(s), etc., any physical exertion, including the use of a TASER
> device, may have an additive effect in contributing to cumulative exhaustion, stress,
> cardiovascular conditions, and associated medical risk(s). To minimize the risk of
> injury, consider the following:
>             b.      If a TASER device application is ineffective in achieving the desired
> effect, consider reloading and redeploying or using other force option(s).
>             c.      If a subject is exhibiting signs or behaviors (such as extreme agitation,
> bizarre behavior, inappropriate nudity, imperviousness to pain . . .) that are
> associated with Sudden In-Custody Death Syndrome, consider combining use of a
> TASER device with immediate physical restraint techniques and medical assistance.
>
> 9.      No weapons system, tool, or technique is effective in 100% of deployments.
> Consider acceptable options, alternatives, and backup plans in case of ineffective
> deployment when deploying, activating, or otherwise using a non-lethal weapon,
> including TASER devices.

[Ex41pp2-3] (emphasis added)

Then in 2006 TASER issued the next version of its 4-page Product Warnings document that was received by CMPD [Ex7¶14], which repeated the general warning regarding injuries or death, and which included the following specific warnings:

> **Reload and Deploy.** If a TASER device application is ineffective in achieving the desired effect, consider reloading and redeploying or using other force option(s), according to approved training and policy.

> **Control and Restrain Immediately.** Begin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the subject.

> **Continuous Exposure Risks.** When practical, avoid prolonged or continuous exposure(s) to the TASER device's electrical discharge. In some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s).

[ExBpp2-3 to Ex7] These warnings were again repeated in TASER's March 1, 2007 4–page warnings, also provided to CMPD. [Ex7¶¶16-18;ExF to Ex7]

TASER also provided CMPD, prior to March 20, 2008, with TASER X26 ECD Operating Manuals [Ex7¶¶9-17;ExsC,D to Ex7] which provide in part:

> **AIMING AND PROBE PLACEMENT**
> Normally, aim the laser at the large muscles groups (center of mass) such as the back, torso, thigh, etc.[10]

> Deploying the X26 at the suspect's back offers several advantages:
> •     Clothing fits tighter.
> •     Surprise factor.
> •     Stronger muscles – even more overwhelming.
> •     Less likelihood of a head, face, throat, or groin exposure.

> The bottom probe impacts at an 8-degree angle from the top probe . . . . This results in a spread of approximately 1' for every 7' of distance from the target. Greater probe spread increases effectiveness. If possible, a minimum 4-inch spread is recommended.

> **POTENTIAL CAUSES OF REDUCED OR NO EFFECTIVENESS**
> * Low Nerve or Muscle Mass. If the probes impact where there is very little muscle mass (e.g., the side of the rib cage), the effectiveness can be significantly diminished.

---

[10] The second officer on the scene in this incident, Officer Joseph A. Pryor, Jr., recalls being trained by CMPD to aim at the subject from behind at upper right shoulder [Ex15p19] *Cf.*, Ex12p38 (trained to aim at center of body mass).

\* Limited Probe Spread. Probe spreads of less than 4 inches . . . result in little or no effect . . . . [Exs Cpp13-14 and Dpp15-16 to Ex7]

Beyond all the above warnings and information, TASER also provided updated versions of its materials prior to March 20, 2008, including Training Versions 12 and 13 in 2006, and Version 14 in December 2007. [Ex7¶¶9-17;Ex24¶¶2-3;ExsC,D to Ex7] These materials contained extensive warnings regarding extended duration applications. For instance Version 12 had PowerPoint® slides on Duration of Field Applications [Ex34p158;Ex35p2 ("prolonged applications should be avoided where practicable")] and on the 5-second "window of opportunity" to "apprehend the subject and go hands on." [Ex34,p187;Ex35p3] Version 13 continued these, with a slide entitled "Avoid Extended or Repeated TASER Device Applications Where Practicable" in both Instructor and User Courses. [Exs36p3;37p3] Version 13's PowerPoints each start with the slide: "**Are TASER Devices Risk Free? No.**" [Exs36p2;37p2] Version 13 materials also incorporated the guidance from the Operator's Manual regarding greater probe spread increasing effectiveness, with the recommendation: "If practicable, deploy M/X26 at suspect's back." [Exs36pp4,5;37pp4,5] And, Version 13 incorporated suggestions for close-range applications, as follows:

### Deployment Distance Considerations

Deployments from 0-7 feet (0-2 meters)
1.  High hit probability
2.  Limited probe spread=low amount of muscle mass affected
3.  Short reactionary distance
Consider targeting the waist area to put one probe above the waist and one below the waist for enhanced effectiveness

[Exs36p4,37p4]

Then, Training Version 14 – provided to CMPD in December 2007 and in effect at the time of Turner's conduct and police encounter – repeated the "split belt-line" recommendations from Version 13 for close deployments, along with the "window of opportunity" slides. [Exs38p175,178;39p2,3] Version 14 included two separate warning slides entitled "**Avoid Extended or Repeated TASER Device Applications Where Practicable**," including the warnings that "Officers should only apply the number of cycles reasonably necessary to allow them to safely restrain the subject," and that if "circumstances require extended duration or repeated discharges,

16

the operator should take care to observe the subject and provide breaks in the TASER stimulation when practicable." [Exs38pp179,180;39pp4,5]

## F.     The Incident Of March 20, 2008: Turner Commits Multiple Crimes At Food Lion Requiring Police Intervention And Use Of Force.

Turner's multiple criminal and tortious activities led to his police encounter. First, Turner stole merchandise from the Food Lion store, was caught on video doing so, was confronted by management on March 20, 2008, and admitted taking the items without payment, committing the crime of embezzlement. [Ex25¶2;Ex9p24;Ex26¶2;Ex28¶3;Ex6] Second, after taking his lunch break that day, Turner came back to the store, and his attitude and demeanor had changed dramatically. [Ex25¶3] After acting belligerently to the female manager, and was directed to leave the premises but he refused, telling her "Fuck You," and stayed on the premises, committing the crime of trespass. [Ex25¶¶3-4;Ex6;Ex30;Ex64]

The service manager had never seen Turner so confrontational so she called the store manager and loss prevention manager simultaneously on two phones. [Ex25¶5] The store manager said Turner's behavior was clear insubordination for which he could be terminated. [Ex25¶5] The service manager then told Turner he was terminated and needed to leave the store but he said, "No I am not fucking leaving the store." [Ex25¶5] Turner refused to leave, followed her into the service area, and stood so close to her that she felt physically intimidated. [Ex25¶5] He then grabbed the microphone for the store's loud speaker and made comments in a very sarcastic voice. [Ex25¶6] She told Turner that if he did not leave right away she would call the police, he said go ahead and call them, she repeated that he needed to leave, but he refused and she called the police. [Ex25¶7]

Third, Turner later confronted the store manager in an angry and hostile manner, saying, "No, fuck that, nigger, you're gonna talk to me NOW!" [Ex26¶5;Ex30] The manager told Turner to leave the store, but he continued his aggression, stating, "No, fuck you. You gonna come talk to me right now. Fuck this shit!" [Ex26¶6;Ex25¶8] The manager again told him to leave, but Turner came closer aggressively which the manager interpreted as a challenge to fight, with Turner flexing his muscles, bouncing on his feet, saying, "Come on, come on!" [Ex26¶6] Turner then flung a Western

17

Union display rack from the counter towards the manager, just missing him but hitting the wall and breaking apart, causing a female customer at the counter to grab her child and flee the area. [Ex26¶7;Ex30] Fearful of his and others' safety, the manager again ordered Turner to leave, but Turner instead threw an umbrella at the manager, barely missing him and striking the wall. [Ex26¶7;Ex25¶9;Ex30] These actions constituted the North Carolina crimes of Communicating a Threat and Assault. [Ex6] Also, his conduct with the service manager and store manager in the public store constituted the North Carolina crime of Disorderly Conduct. [Ex6]

Next, as Officer Dawson entered the Food Lion (as a result of the 911 call due to Turner's behavior), Officer Dawson heard Turner say "Fuck you." [Ex12pp74-75] Officer Dawson then witnessed Turner's aggressiveness towards the store manager, witnessed Turner turn and say, "Fuck the Police," saw Turner throw something at the store manager, and perceived that Turner was getting ready to hit the manager. [Ex12pp34-36,75-76;Ex25¶9;Ex30] Officer Dawson was heard to tell Turner to calm down and "don't make me have to do this," but Turner, with fists still clenched [Ex26¶9], again said "Fuck the police" [Ex25,¶9], and moved towards Dawson (as cannot be disputed from the video and screenshots, below, with Dawson's hands and then feet in the lower right hand corner of each sequential image); Dawson then deployed his X26 ECD to Turner with probes right of sternum and right stomach area. [Ex12pp36-37;Ex25¶9;Ex26¶9;Ex30]



18

As with the other crimes outlined above, according to recently retired Mecklenburg County District Attorney's Office Superior Court Coordinator Stephen W. Ward, Turner's conduct constituted the North Carolina crime of Resisting an Officer. [Ex6][11]

During or after the encounter with Officer Dawson, Turner suffered a cardiac arrest and was pronounced dead later at the hospital. Although unknown to Officer Dawson or store management at the time, Turner was in possession of three baggies of marijuana at the time of the incident. [Ex10pp38,123,143;Ex46¶31;Ex29;Ex57;Ex58]  Officer Dawson suspected drugs noting Turner's red eyes. [Ex. 75; Ex. 3,p.12]

## G.    Autopsy Results And Cause Of Death.

The medical examiner performed an autopsy, but did not test for all drugs. [Ex10p42;Ex4pp9-12;Ex3p13] Several experts in this case suspect drug use by Turner given his uncharacteristically agitated behavior and the presence of marijuana on his person [Ex16pp71,95-96,117-18;Ex17pp46,71,104-07;Ex18p84], but the toxicology tests performed did not detect any, and testing was not done for THC, PCP, or methamphetamine. [Ex4,pp9-12;Ex16pp107-08,112-13] The medical examiner – who admits that it is not established or generally accepted that TASER ECDs cause cardiac issues in humans [Ex10,p124] – determined the cause of death to be acute ventricular dysrhythmia, specifically VF. [Ex31] The medical examiner further found that this lethal disturbance in the heart rhythm was precipitated by the agitated state and associated stress as well as the use of a conducted energy weapon. [*Id.*] The autopsy report quotes a June 2008 NIJ Interim Report noting that "there is no conclusive medical evidence within the state of current research that indicates a

---

[11] Witnesses from different locations have different recollections of what Officer Dawson said to Turner, with one saying he said, "Don't move any more. This is your last warning before I TASER you" [Ex27¶4], another describing him saying, "Take one step back" [Ex45¶4], another reporting, "What are you looking at me like that for" [Ex44¶3], the store manager reporting that the officer "was saying something like 'calm down son' or 'calm down sir'" [Ex26¶9]; and the service manager recalls the same instruction from the officer [Ex25¶9]. Regardless of what Officer Dawson precisely said, it is undisputed that Turner moved towards him with fists clenched moments after assaulting the manager and saying "Fuck the Police," and that Turner had an "angry facial expression I can only describe as looking like he wanted to break the officer in half." [Ex26¶9]  A customer at the store was so startled and frightened by Turner's outbursts that she literally tried to hide behind a magazine rack at the checkout lane. [Ex43¶2]

high risk of serious injury or death from the direct effects of CED exposure." [*Id.*] The medical examiner does *not* conclude that the ECD caused VF in Turner by electrical current reaching the heart. [Ex10p126] His testimony on this point reads:

> Q.   In Darryl Turner's death you don't hold the opinion to a reasonable degree of medical certainty that the electrical current from the CEW reached his heart and resulted in a dysrhythmia; correct?
>
> A.   I guess based on the totality of the evidence that's out there, *there's no proof that that's what happens with the electrical current.* And *I don't know specifically what happened with him*, but I guess I can't say that it's the electrical current. There's other things going on, and I don't know what -- I don't know what exactly to the percentage or the exact aberrational thing the taser caused him to go into V-Fib. But it's there, *but I don't think it's the electrical current because the studies are medically reasonably certain it's not the current going through the heart. Because the studies that have been done do not show that. They actually show that it doesn't do that.* But, again, I guess that's the best we have right now. * * *

[Ex10pp148-49] (emphasis added)

**H.   CMPD's Suspension Of Officer For Prolonged Duration X26 ECD Application.**

Officer Dawson's deployment of the ECD was reviewed by the CMPD Review Board. [Ex32] "After a thorough review of the evidence, the Board determined that the initial decision to discharge the TASER [ECD] was within our procedures, but the prolonged use of the TASER [ECD] was not." [Ex32] The Review Board noted, "Officer Dawson has been suspended for five days and he will receive additional training concerning the use of the TASER [ECD]." [Ex32] TASER retained as an expert in this case the School Director and Chief Instructor for Subject Control/Arrest Techniques from the North Carolina Justice Academy, John Combs. Director Combs has provided expert opinion echoing the CMPD Review Board, specifically concluding that the initial ECD application was justified based on Turner's conduct, but that the continued duration of the ECD discharge beyond the initial 5-second window of opportunity was contrary to both TASER's training materials and CMPD policy. [Ex5;Ex19p84]

**I.   Plaintiffs' Claims.**

Plaintiffs, having settled with the City [Ex20pp25-26;Ex23], now seek recovery from TASER alleging "negligent training." [Compl.] Plaintiffs' theory is that the extended duration ECD

application caused VF by sufficient electrical current somehow reaching Turner's heart. [Ex13,pp87-88,163,192-93]

### III.   LEGAL STANDARDS

Summary judgment is mandated where a party fails to establish the essential elements of his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed.R.Civ.P.56. Once the moving party informs the Court of the basis for its motion, the burden shifts to the nonmovant to present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The Court "must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party." *Couick v. Wyeth, Inc.*, 691 F.Supp.2d 643, 645 (W.D. N.C. 2010) (Conrad, J.). "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Ricci v. DeStefano*, 129 S.Ct. 2658, 2677, 577 U.S. __ (2009)).

North Carolina has *not* adopted strict liability for product cases; instead, its Product Liability Act governs this case. *See* NCGS ch. 99B (1995); *DeWitt v. Eveready Battery Co.*, 565 S.E.2d 140, 146, 150 (N.C. 2002). Plaintiffs proceed only on a theory that TASER failed to train (warn), which sounds in product liability. *See* NCGS §99B-1(3) (product liability includes claim "brought for or on account of . . . death . . . [allegedly] caused by or resulting from the . . . warning, instructing, marketing, selling, advertising, packaging, or labeling" of a product); *see also Morgan v. Cavalier Acquisition Corp.*, 432 S.E.2d 915, 919 (N.C. Ct. App. 1993).[12]

A "products liability claim grounded in negligence requires the plaintiff prove (1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff damage." *Red Hill Hosiery Mill,*

---

[12] At times, Plaintiffs imply that TASER had a duty to "train" CMPD officers. [Compl.¶¶5,14] To the extent Plaintiffs intend something beyond TASER's provision of product warnings, no such duty existed. The duty to train officers remains with CMPD, not a private actor such as TASER. [Ex8¶12] *See also City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (extending liability for "inadequacy of police training" only to city and "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact"); *Lee v. Metropolitan Gov. of Nashville*, 596 F.Supp.2d 1101, 1111 n.5 (M.D. Tenn. 2009) ("every department will ultimately conduct TASER [ECD] training in its own way").

*Inc. v. Magnetek, Inc.*, 530 S.E.2d 321, 326 (N.C. Ct. App. 2000); *see also Smith v. Wyeth-Ayerst Labs. Co.*, 278 F.Supp.2d 684, 706 (W.D. N.C. 2003) (requiring duty, breach, causation, and damages). "In North Carolina, a manufacturer is not an insurer of the safety of products." *Cockerham v. Ward*, 262 S.E.2d 651, 654 (N.C. Ct. App. 1980). "It is well settled that negligence is never presumed from the mere fact that an accident or injury has occurred." *Id.*, 262 S.E.2d at 656. Plaintiffs have no evidence to establish their product liability claim against TASER.

## IV. DISCUSSION: TASER IS ENTITLED TO SUMMARY JUDGMENT ON MULTIPLE, SEPARATE INDEPENDENT GROUNDS

### A. The Claims Fail Because The Warnings Were Not Defective.

#### 1. TASER Repeatedly Warned Against Prolonged Extended ECD Applications.

"No manufacturer or seller of a product shall be held liable in any product liability action for claim based upon inadequate warning or instruction unless the claimant proves that the manufacturer or seller acted unreasonably in failing to provide such warning or instruction." NCGS §99B-5(a). In short, Plaintiffs must establish a defect in TASER's warnings and TASER's unreasonable failure to provide an alternative warning. *See, e.g., Magnetek*, 530 S.E.2d at 326 n.5 (summary judgment even with product malfunction; no evidence of defect). That they cannot do.

TASER's warnings – including the prolonged application warnings here – have been found adequate as a matter of law in other in-custody death cases already. *See Marquez v. City of Phoenix*, 2010 U.S. Dist. LEXIS 88545, 21 (D. Ariz. 2010) ("warnings capture the circumstances of this case"); *Lee*, 596 F.Supp.2d at 1127-28 (finding TASER's warnings about repeated exposures adequate as a matter of law). Indeed, *Marquez* found that TASER's warnings about "prolonged or continuous" exposures were adequate as a matter of law in a claim of cardiorespiratory compromise and death. *See Marquez, supra* at 17-23. Likewise, *Lee* granted summary judgment on TASER's warnings about "repeated exposures" because including "metabolic acidosis" would not have added anything useful when the warning was intended for law enforcement, not physicians. *See Lee*, 596 F.Supp.2d at 1128; *see also Higgins v. E.I. Du Pont de Nemours Co.*, 863 F.2d 1162, 1165, 1167 (4th Cir. 1988) (although none of DuPont's labels warned specifically of teratogenic effects, the labels

repeated safety precautions to avoid injury and "were adequate enough to warn plaintiffs that they were not sufficiently well-trained to use Imron paint").

Just as in *Higgins*, 863 F.2d at 1168, and *Jenkins v. Helgren*, 217 S.E.2d 120, 123-25 (N.C.. App. 1975), TASER "had a right to rely on its warning" – particularly warnings against prolonged exposures that TASER repeated numerous times. Undisputed proof positive of the adequacy of these warnings is CMPD's reaction by promptly issuing an internal advisory document to its officers. [Ex42] Summary judgment should be entered for TASER accordingly on this basis alone.[13]

### 2. TASER Neither Knew Nor Should Have Known Of An Unreasonably Dangerous Condition In Its ECD Or Warnings.

Additionally, Plaintiffs cannot establish that TASER knew or should have known of an unreasonably dangerous condition at the time of sale or the March 20, 2008 incident. "To prove a product defective is one thing; to prove that the defect flowed from a failure to exercise reasonable care is quite another. Proof of defect does not, without more, prove negligence." *Magnetek*, 530 S.E.2d at 326 n.5. "No manufacturer or seller of a product shall be held liable in any product liability action for a claim based upon inadequate warning or instruction unless the claimant proves [that] . . . at the time the product left the control of the manufacturer or seller, the product, without an adequate warning or instruction, created an unreasonably dangerous condition that the manufacturer or seller *knew, or in the exercise of ordinary care should have known*, posed a substantial risk of harm to a reasonably foreseeable claimant."[14] NCGS §99B-5(a)(1) (emphasis added). A manufacturer has no responsibility for "consequences which are merely possible according to occasional experience." *Kientz v. Carlton*, 96 S.E.2d 14, 18 (1957) (affirming nonsuit without other incidents with same product under same or similar circumstances); *see also Travelers Ins. Co. v. Chrysler Corp.*, 845 F.Supp. 1122, 1125 (M.D. N.C. 1994) (granting summary judgment on product claim without evidence the seller knew or should have known of defect); *Mills v. Coach Crafters, Inc.*, 1996 U.S. Dist.

---

[13] Plaintiffs have a warnings expert, but as set forth in the separate motion to exclude his opinions under Rule 702, he does not even address the extended duration warnings at issue in this case.

[14] The statutory scheme provides an alternative for post-sale obligations to warn, but that remains inapplicable by any evidence here. *See* NCGS §99B-5(a)(2).

23

LEXIS 14632, 15-16 (M.D. N.C. 1996) (granting summary judgment without evidence of known or knowable defect).

Thus, in *Rosa v. TASER*, 675 F.Supp.2d at 1012, the court concluded that nothing established that TASER knew or should have known that its ECDs caused metabolic acidosis in humans contributive of cardiac death in light of the generally recognized and prevailing scientific knowledge at the time (or even thereafter). As here, plaintiffs attempted to rely on dissimilar, unreliable, or occasional untested references in the press or literature to establish a state of science that would constructively confer knowledge on TASER. *Rosa* found that there was "simply no basis upon which a reasonable jury could conclude that [such sources were] either generally recognized or prevailing in the scientific and medical communities, let alone that [they] were both." *Id.* at 1014.

Plaintiffs have adduced no evidence establishing that TASER knew or should have known that the TASER ECD at time of sale or in March 2008 had been established as capable of causing VF in *humans*. Plaintiffs can point only to inapposite pig studies and two distinguishable anecdotes. Without evidence that such a link was known or knowable, summary judgment must be entered for TASER, just as it was against the same lead counsel in *Rosa*.[15]

**B.  The Claims Fail Because There Is No Evidence That Different Warnings Would Have Resulted In A Different Outcome.**

It is not enough to prove causation in the abstract. It is not enough to prove that a product caused an injury; a *defect* in the product must cause an injury. In this case, Plaintiffs lack the precise link between the alleged defect (warning inadequacy) and the resulting injury. "No manufacturer or seller of a product shall be held liable in any product liability action for claim based upon inadequate warning or instruction unless the claimant proves . . . that the failure to provide adequate warning or instruction was a proximate cause of the harm." NCGS §99B-5(a); *see also Wyeth-Ayerst*, 278 F.Supp.2d at 706 ("a products liability plaintiff asserting a failure to warn claim must show that

---

[15] Plaintiffs might try to rely on post-incident 2009 warnings from TASER about avoiding chest shots when practicable for better incapacitation and to avoid controversy, but subsequent warnings do not prove what was known or knowable at the time of sale or incident or even thereafter, and are inadmissible in any event under Fed.R.Evid. 407.

the injury was caused by the defendant's failure to warn").

Most often, summary judgment translates from the failure to establish that an alternative warning would have altered the product user's or claimant's behavior. *See DeWitt v. Eveready Battery Co.*, 550 S.E.2d 511, 518 (N.C. Ct. App. 2001) (summary judgment where no evidence that more prominent or conspicuous warning would have prevented accident); *Evans v. Evans*, 569 S.E.2d 303, 306-07 (N.C. Ct. App. 2002) (even with expert testimony, still no evidence that "failure to provide the warnings was the proximate cause of plaintiff's injuries"); *cf. Richardson v. General Motors Corp.*, 223 F.Supp.2d 753, 757 (M.D. N.C. 2002) (factual issue only when "evidence that a product user would have altered her conduct when presented with an adequate warning").

For instance, in *Edwards v. Atro Spa*, 891 F.Supp. 1074, 1077 (E.D. N.C. 1995), a builder was framing under a ladder when a coworker's nail gun accidentally discharged. The builder sued the nail gun manufacturer for failure to warn. Distinguishing other cases, *Edwards* granted summary judgment for the manufacturer because the builder had not presented evidence that "had plaintiff known or been informed of the dangers associated with the product, he would have changed his behavior as a result." *Id.* at 1078. Speculation cannot go to the jury. *See id.; see also Snoznik v. Jeld-Wen, Inc.*, 2010 U.S. Dist. LEXIS 46814, 2-68 (W.D. N.C. 2010) (summary judgment for manufacturer; homeowner had not established that a warning defect caused his injury; no evidence that a different instruction would have altered behavior, without which an "inference that an adequate warning would have resulted in a change of [his] behavior [was] simply speculation").

Such is the case here too. There is no evidence that any alternative warning would have altered behavior. *See id.; see also Edwards*, 891 F.Supp. at 1078. Indeed, Officer Dawson admits it would be "*speculation*" that he would have done anything differently with alternative warnings. [Ex12p64] Speculation, of course, does *not* create an issue of fact. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) ("unsupported speculation is not sufficient to defeat summary judgment"); *Edwards*, 891 F.Supp. at 1078 (same). Summary judgment should be entered for TASER. *Accord, Lee, supra* at 1128 (no evidence that any "inadequate warning" from TASER caused injury).

**C.    The Claims Are Barred By Product Use Contrary To Warnings.**

The misuse of the TASER ECD by the Officer – its use contrary to express and repetitive instructions against prolonged exposures from both TASER and CMPD – precludes recovery against TASER. *See* NCGS §99B-4(1). "No manufacturer or seller shall be held liable in any product liability action if . . . the use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings." NCGS §99B-4(1). This provision bars liability where the user ignores warnings or (in their absence) common sense. *See Goodman v. Wenco Foods, Inc.*, 423 S.E.2d 444, 452 (N.C. 1992).

This Court reemphasized the point just a month ago. In *Durkee v. C. H. Robinson Worldwide, Inc.*, 2011 U.S. Dist. LEXIS 9254, 13-23 (W.D. N.C. 2011), a driver and passengers injured in an automobile crash sued the manufacturer of a "texting" system installed in the other driver's vehicle, claiming the product distracted the driver. In dismissing the case, this Court found that the device manufacturer had no duty to anticipate the misuse of its texting system in a manner to cause injury. The passengers "were not users of the product" and their "harm stemmed from the misuse of the product by the user." *Id.* at 22. This Court held that extending the duty to anticipate misuse so far would "turn products liability law on its head." *Id.* at 17. The "makers of firearms and even automobiles would have to try to account for the potential harm that their users might cause to third parties when using their products in a manner contrary to what was intended." *Id.*

Here, for nearly *three years* before the altercation with Turner, TASER had repeatedly warned agencies, including CMPD, against continuous and extended duration ECD applications, doing so first with a special Training Bulletin in June 2005. So important was this warning to CMPD that within months it issued its own internal advisory document to CMPD officers through its learning management system. Everyone in the department would have been obligated to review this warning. [Ex42] *See also* NCPI—Civil §744.08 (diligence under NCGS §99B-4(1) "means that the user has an affirmative duty to read [the warning]"). TASER issued specific Product Warnings in 2005,

separately in 2006, and again in 2007 to CMPD that likewise warned against using TASER ECDs in prolonged applications. TASER further provided updated TASER CD/DVD Training Versions 12, 13, and 14 in 2006 and 2007 again expressly warning of the same concern.

The CMPD Review Board determined that Officer Dawson had used the ECD contrary to instructions and procedure and suspended him accordingly, with additional training on the ECD planned on his return. Director Combs echoes this finding without any opposition from Plaintiffs in concluding that the initial ECD application was justified based on Turner's conduct, but that the continued use of the ECD beyond the initial 5-second window of opportunity was contrary to both TASER's training materials and CMPD policy. No evidence disputes this ECD misuse. Summary judgment should be entered for TASER on this basis as well. *See* NCGS §99B-4(1).[16]

**D.    The Claims Are Barred By Decedent's Contributory Negligence.**

In addition, Turner negligently created the situation that required police intervention and Officer Dawson's use of force with the ECD. Indeed, Turner was negligent *per se* by ignoring warnings and committing multiple criminal acts, including trespassing, assault, disorderly conduct, and resisting an officer. His contributory negligence bars his product liability claim as a matter of law. *Sawyer v. Food Lion, Inc.*, 549 S.E.2d 867, 870 (N.C. Ct. App. 2001) (summary judgment; contributorily negligent as a matter of law by using scaffolding near risks).

The Act provides: "No manufacturer or seller shall be held liable in *any* product liability action if . . . the claimant [is contributorily negligent]." NCGS §99B-4 (emphasis added); *see also Nicholson v. American Safety Utility Corp.*, 488 S.E.2d 240, 244 (N.C. 1997) (stating same and holding the statute codified the common law of contributory negligence). "In a product liability action founded on negligence, there is no doubt that contributory negligence will bar [plaintiff's] recovery

---

[16] The line of authority from *Indemnity Ins. Co. v. American Euercopter LLC*, 2005 U.S. Dist. LEXIS 34011 (M.D. N.C. 2005), and *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138 (4th Cir. 2001), does not defeat the misuse defense here because CMPD was the trainer of Officer Dawson, not TASER, and CMPD determined whether, when, and how to train its officers. TASER had no control over whether and how CMPD trained, and, for instance, whether and how it disseminated TASER's updated warnings and training materials to CMPD officers. The CMPD trainers at the CMPD Academy were CMPD employees and agents, not TASER employees or agents. [Ex8¶12;Ex59¶¶1-4]

to the same extent as in any other negligence case." *Nicholson*, 488 S.E.2d at 244; *accord Smith v. Fiber Controls Corp.*, 268 S.E.2d 504, 506 (N.C. 1980) (same); NCGS §99B-4. Even slight negligence bars a claim. "[N]egligence which concurs with that of the defendant in producing the occurrence which caused the original injury will bar all recovery, even though the plaintiff's negligence was comparatively small." *Miller v. Miller*, 160 S.E.2d 65, 73 (N.C. 1968). In other words, "if plaintiff's own negligence is one proximate cause of [his] own injury, [he] is precluded from recovery irrespective of the acts of others." *Culler v. Harmlett*, 559 S.E.2d 195, 200 (N.C. Ct. App. 2002); *see also Lienhart*, 255 F.3d at 149 (contributory negligence need not cause *all* the alleged injury; as causing *any* part bars recovery); *Hairston v. Alexander Tank and Equip.*, 311 S.E.2d 559, 566 (N.C. 1984) ("signifies contribution rather than independent or sole proximate cause"). Turner need not have been actually or subjectively aware of the unreasonable danger of injury; objectively he ignored unreasonable risks that would occur to a prudent person interacting with law enforcement and faced with its use of force. *See Fiber Controls*, 268 S.E.2d at 507.[17]

Turner's hostile and knowing engagement of store management and then law enforcement ("Fuck the police") indisputably establish contributory negligence as a matter of law. *See Sawyer*, 549 S.E.2d at 870 ("person who knowingly exposes himself to a risk which he has an opportunity to avoid may be contributorily negligent as a matter of law"). "A plaintiff is contributorily negligent when he fails to exercise such care as an ordinarily prudent person would exercise under the circumstances in order to avoid injury." *DeWitt*, 550 S.E.2d at 516. Turner disregarded every reasonable opportunity to avoid the risk of confrontation and injury – warnings given by management and law enforcement. Contributory negligence that bars product liability claims ranges from foolish to outright criminal behavior. *See Culler*, 559 S.E.2d at 198-200 (careless crossing of street contributory negligence as a matter of law); *Lashlee v. White Consol. Indus., Inc.*, 548 S.E.2d 821,

---

[17] The doctrine applies not just to misuse of the product, but to a plaintiff's entire conduct "under the circumstances in the use of the product." *Nicholson*, 488 S.E.2d at 241, 244; *Jones v. Owens-Corning Fiberglass Corp.*, 69 F.3d 712, 721-22 (4th Cir. 1995) (focus of contributory statute not on plaintiff's "use of the product" but whether he exercised reasonable care under the circumstances of its use). The principles of contributory negligence apply in this case whether interpreted as a warning or training case under the product liability scheme. *See Champs Conven. Stores, Inc. v. United Chemical Co.*, 392 S.E.2d 761 (N.C. App. 1990).

827 (N.C. App. 2001) (affirming summary judgment; plaintiff attempted to cut down tree on ladder while aware of chainsaw's kickback potential). Turner was not just carelessly crossing a street, but engaged in serious criminal acts. *See Goodman*, 423 S.E.2d at 452 (if statute "imposes upon a person a specific duty for the protection of others, a violation of such statute is negligence *per se*").[18]

Notably, it has been expressly held that a person's confrontational behavior that led to his fatal shooting by law enforcement was an act of contributory negligence that barred a claim for wrongful death. In *Hinton v. City of Raleigh*, 264 S.E.2d 777, 779 (N.C. Ct. App. 1980), the court held that a robbery suspect was contributorily negligent as a matter of law in participating in a robbery, refusing to surrender when ordered by police, and then crouching and pointing towards officers. Likewise, in *Braswell v. N.C. A&T State Univ.*, 168 S.E.2d 24, 30-31 (N.C. Ct. App. 1969), the court rejected a claim from a person who joined a "mob" to force gymnasium doors open at a dance and sustained fatal wounds from an accidental ricocheted shooting by campus security officers:

> [J]oining in illegal mob action is not an exercise of reasonable care [and] in so doing plaintiff *assumed the risk of whatever injury he might receive as a result*. In addition, the illegal conduct of the mob of which the plaintiff was voluntarily a part was such as would reasonably be calculated to provoke the security officer into taking some action to disperse the mob. . . . [T]he plaintiff was contributorily negligent in joining and rejoining the crowd. He knew they were acting in an unruly and unlawful manner and that the officer had warned them to stop trying to break in the doors. . . . [T]he plaintiff was contributorily negligent as a matter of law.

*Id.* at 30-31 (emphasis added).

Turner was his own mob. When confronted, even after being given the opportunity to calm down over lunch, he returned with three baggies of marijuana, swore violently at store management, trespassed after being told to leave, assaulted employees, hurled objects at their heads, and

---

[18] The videotape particularly exhibits this criminal behavior, which cannot be contradicted. *See Scott v. Harris*, 550 U.S. 372, 379 n.5, 380 (2007) ("We are happy to allow the videotape to speak for itself. . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life . . . The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."). Thus, witness Wilson's declaration that Turner never stepped towards the officer is blatantly contradicted not only by other witnesses, but by the videotape.

29

threatened bodily harm. The officer arriving at the scene saw Turner's aggression and threats, only to see Turner turn his anger toward him. "Fuck the Police," he said, as he viciously threw another object at the store manager and prepared to hit him. Turner took a hostile step toward Officer Dawson with fists clenched, who finally used his TASER ECD to restrain Turner. *See supra* at 21-24.

Such is Turner's negligence "under the circumstances in the use of the product." *Nicholson*, 488 S.E.2d at 241, 244; *see also* NCGS §99B-4(3). He unreasonably created the situation leading to police intervention and use of force that inherently has risk of arrest-related injury or even death. His actions do not need to be the sole cause, just *a cause*. *See Culler*, 559 S.E.2d at 200; *Diorio v. Penny*, 405 S.E.2d 789, 790 (N.C. Ct. App. 1991) ("court will grant summary judgment in such matters where the evidence is uncontroverted that a party failed to use ordinary care and that want of ordinary care was at least one of the proximate causes of the injury"). That they were. Turner's negligent actions bar this product liability claim. Summary judgment should be entered for TASER.

**E.    The Claims Fail As A Matter Of General Causation: It Was Not Established At The Time Of Sale, Use, Or Even Today That An ECD Causes VF In Humans.**

Plaintiffs have adduced no evidence establishing general causation – that ECDs cause VF in humans. Causation is an essential element to this product liability case. *See Goodman*, 423 S.E.2d at 452; *Wyeth-Ayerst*, 278 F.Supp.2d at 706 (causation is essential). Plaintiffs must present expert medical testimony to establish causation in this complex product liability case. *See Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F.Supp.2d 465, 471, 478 (M.D. N.C. 2006); *Driggers v. Sofamor, S. N.C.*, 44 F.Supp.2d 760, 764-65 (M.D. N.C. 1998) ("where the injury is complicated . . . expert medical testimony on the issue of causation must be provided"). "In cases that require medical evidence to establish causation, courts have typically drawn a distinction between 'general causation' and 'specific causation.'" *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 676 (M.D. N.C. 2003); *Ortho-Clinical*, 440 F.Supp.2d at 471 (same); *In re Bausch & Lomb*, 693 F.Supp.2d 515, 518 (D. S.C. 2010) ("To establish medical causation in a product liability case, a plaintiff must show both general causation and specific causation."); *see also Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334 n.4 (11th Cir. 2010) ("to prevail on his products liability claims, [plaintiff] must offer proof of both general

causation . . . and specific causation"); *accord In re Panacryl Sutures Prods. Liab. Cases*, 263 F.R.D. 312, 325 (E.D. N.C. 2009) (expressing concerns with general causation).

General causation concerns whether, based on reliable scientific proof such as peer-reviewed literature, the product *is capable of causing* (can cause) the alleged injury, whereas specific causation concerns whether the product *actually caused* the alleged injury in the specific instance. *See Ortho-Clinical*, 440 F.Supp.2d at 471; *Dunn*, 275 F.Supp.2d at 676; *see also Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351-55 (5th Cir. 2007) (same); *Smith v. General Motors Corp.*, 376 F.Supp.2d 664, 667 (W.D. Va. 2005), *aff'd sub nom.*, *Estate of Smith v. General Motors Corp.*, 179 Fed.Appx. 890 (4th Cir. 2006) ("General causation is established by demonstrating that exposure to the [product] at issue can cause the disorder at issue, whereas specific causation is establishing that the exposure suffered by plaintiff is the actual cause of plaintiff's disorder.").

Plaintiffs lack evidence of general causation, so present no reason to even consider specific causation. "Where a plaintiff is not able to establish general causation, it is unnecessary to consider whether plaintiff can establish specific causation." *Ortho-Clinical*, 440 F.Supp.2d at 471, 476 (quotations omitted) ("court need not go further"); *Dunn*, 275 F.Supp.2d at 675 ("unnecessary to consider [plaintiff's] specific causation experts" since no evidence of "general causation"); *In re Bausch*, 693 F.Supp.2d at 518 ("general causation as a necessary precursor to proving specific causation is the rule in all jurisdictions"); *see also Kelley v. American Heyer-Schulte Corp.*, 957 F.Supp. 873, 882 (W.D. Tex. 1997) ("[absent] any evidence regarding general causation, the court will not permit [the doctor] to testify as to specific causation").

While not exclusive, a "literature review can be an appropriate part of a method of determining general causation." *Ortho-Clinical*, 440 F.Supp.2d at 472, 476, 478 (finding no study established link between mercury and autism to prove general causation and granting summary judgment for manufacturer); *Dunn*, 275 F.Supp.2d at 680-84 (granting summary judgment without epidemiological testing, clinical studies, case reports, or peer-reviewed articles establishing general causation); *see also Kilpatrick*, 613 F.3d at 1334-44 (affirming summary judgment for manufacturer since plaintiff's expert had no testing, studies, or other evidence of general causation); *McClain v.*

*Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239-55 (11th Cir. 2005) (reversing jury verdict against product manufacturer due to no reliable evidence of general causation).

Premier experts in forensic pathology, cardiovascular pathology, ECD research, and emergency medicine have all concluded that an "[ECD] application has not been shown to cause sudden death in humans." [Ex1p4;Ex2p5;Ex3p13] Dr. Gary Vilke, the lead author of a study requested by the American Academy of Emergency Medicine to review all peer-reviewed medical literature on ECDs, concluded that, "[a]s of March 20, 2008 and today, no peer-reviewed published scientific or medical literature concluded that TASER ECDs cause ventricular fibrillation or cardiac dysrhythmias in humans." [Ex3p13] The Charlotte Medical Examiner performing the Turner autopsy likewise confirmed that it "has not been shown that the TASER [ECD] in and of itself can cause . . . ventricular arrhythmia or whatever, a heart problem." [Ex10p125] He agrees the medical community has not generally accepted such an untested and speculative view of ECDs. [*Id.*124,135-36] No epidemiological study concludes that an ECD application causes death in humans. [Ex13p69] *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005) ("epidemiology is the best evidence of general causation"). No electrophysiology journal has published any peer-reviewed article concluding that ECDs can cause VF in humans. [Ex13p80, "Not yet. Not yet."] Other than two anecdotal letters rather than tested research, and one retrospective article stating that one death was "suggestive of" or "consistent with" ECD-induced VF, even Plaintiffs' expert concedes that no peer-reviewed scientific or medical literature has indicated that a TASER ECD can cause VF in humans. [*Id.*77-78, "Not in humans. In pigs, well established."][19]

---

[19] An analysis of other data merely compels summary judgment for TASER. *See Ortho-Clinical*, 440 F.Supp.2d at 472, 476, 478 (examining and disregarding data on general causation); *Dunn*, 275 F.Supp.2d at 680-84 (analyzing claimed clinical studies and case reports regarding general causation). Plaintiffs' expert cites a two paragraph anecdotal letter from Kim and Franklin, but that letter itself states that "no definite causative link between death and the use of a stun gun has been made," and there is no evidence that this anecdotal letter had actually been peer-reviewed. [Ex13p36] And, subsequent evidence from the paramedic at the scene establishes that the suspect had a normal pulse and cardiac rhythm after the ECD application, and then again approximately two minutes later, both inconsistent with VF caused by the ECD. [Ex13pp33-35] Zipes also cites the Cao anecdote, but that involved a pacemaker with the leads directly attached to the myocardium (hardly the same scenario as Turner). [*Id.*29-30] In addition, the Cao anecdote concerned cardiac capture, but not VF, and Plaintiffs' expert Zipes readily admits that VF is different. [*Id.*21, "But producing VF is a different thing."] He also cites a 2009 retrospective article which came out after Turner's March 2008

32

By contrast, the human research studies on potential ECD effects are extensive, and have *never* produced VF, despite trans-cardiac vectors with the probes and extended duration applications. The "vast body" of peer-reviewed literature and studies has reported on the utility and cardiac safety of ECDs with humans. Plaintiffs cannot overcome this "vast body" of literature. *See Norris*, 397 F.3d at 882 ("where epidemiology is available, it cannot be ignored"; "where there is a large body of contrary epidemiological evidence, it is necessary to at least address it with evidence that is based on medically reliable and scientifically valid methodology"); *Rutigliano v. Valley Business Forms*, 929 F.Supp. 779, 783 (D. N.J. 1996) (granting summary judgment without studies or published data since product "case requires expert testimony to satisfy her burden with respect to both general causation and specific causation"). Plaintiffs run this case aground with selected swine tests. [Ex13pp77-78, "Not in humans. In pigs, well established."] Federal courts in North Carolina, however, have already rejected such extrapolation from animals to humans. *See Dunn*, 275 F.Supp.2d at 683 (disregarding animal studies to prove general causation); *see also Sorensen v. Shaklee Corp.*, 31 F.3d 638, 646 n.12 (8th Cir. 1994) ("extrapolating to humans from animal studies is problematic"); *In re Agent Orange Prod. Liab. Lit.*, 611 F.Supp. 1223, 1241 (E.D. N.Y. 1985) (animal studies "are of so little probative force and are so potentially misleading as to be inadmissible"), *aff'd*, 818 F.2d 187 (2d Cir. 1987); *Turpin v. Merrell Dow Pharms.*, 959 F.2d 1349, 1358-61 (6th Cir. 1992) (animal studies insufficient to support expert opinion on causation). What is more, such studies would be an unreliable extrapolation as swine fibrillate more easily than humans. [Ex11pp119-20]

As a matter of general causation, Plaintiffs cannot in this Court establish that TASER ECDs cause VF in humans. That has to be established first, if ever, in the lab and peer-reviewed literature. Summary judgment should be entered for TASER accordingly, without even considering specific causation, just as federal courts have previously done in this jurisdiction for this same failing. *See*

---

incident, but that paper merely shares an anecdote of a case that is "suggestive of" or "consistent with" ECD-inducted VF, but not opining that the ECD exposure actually causes VF. *See also Sakaria v. Trans World Airlines*, 8 F.3d 164, 172-73 (4th Cir. 1993) ("In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder."); *Dunn*, 275 F.Supp.2d at 681 (opinions "merely expressing 'possibilities' do not suffice").

*Ortho-Clinical*, 440 F.Supp.2d at 472, 476, 478; *Dunn*, 275 F.Supp.2d at 680-84; *see also Kilpatrick*, 613 F.3d at 1334-44; *Knight*, 482 F.3d at 351-55; *McClain*, 401 F.3d at 1239-55.

**F.      Only The Personal Representative Has Standing.**

Beyond the merits issues, as a standing matter, only the Administratrix of the Estate has standing. *Westinghouse v. Hair*, 418 S.E.2d 532, 533 (N.C. Ct. App. 1992) ("An action for wrongful death is a creature of statute and only can be brought by the personal representative"); *Young v. Mashburn*, 180 S.E.2d 43, 45 (N.C. Ct. App. 1971) ("If an action for wrongful death is instituted by one other than the personal representative of a decedent, duly appointed in this State, it should be dismissed"), *quoting Graves v. Welborn*, 133 S.E.2d 761 (1963). Thus, the claim by Devoid Turner, and the individual claim of Tammy Lou Fontenot, must be dismissed.

**G.      The Claim For Punitive Damages Fails.**

Beyond the multiple, separate, independent grounds requiring summary judgment on the merits, there is no evidence of "willful or wanton" conduct to warrant punitive damages against TASER. *See Lashlee*, 548 S.E.2d at 827-28 (granting summary judgment despite limited warnings and failure to require dealers to attend safety training); *see also* NCGS §1D-15(a) (listing as aggravating factors fraud, malice, or willful or wanton conduct). "Punitive damages are recoverable in a negligence action only upon a showing that that the negligence was gross or wanton" – that is, done with "conscious and intentional disregard" of the safety of others. *Edwards*, 891 F.Supp. at 1081.

TASER, and numerous other independent researchers, have conducted extensive scientific and medical testing of its ECDs. TASER provides extensive warnings, and continuously updates these in keeping with the current state of science and medical analysis. In addition, TASER manufactures a product that protects life and promotes public safety. The utility of its ECDs has been underscored time and time again by law enforcement. TASER should be encouraged in its efforts, not punished. There is no basis in this record to support a finding of willful or wanton conduct, so summary judgment should be entered on the punitive damages claim.

34

## V. CONCLUSION

Summary judgment should be entered for TASER accordingly.

Respectfully submitted,

s/ Scott D. MacLatchie

Scott D. MacLatchie (Bar No. 22824)
WOMBLE, CARLYLE, SANDRIDGE & RICE
301 South College Street, Suite 3500
Charlotte, North Carolina 28202
Telephone:     (704) 331-4942
Email:         SMacLatchie@wcsr.com

s/ John R. Maley

John R. Maley, *Pro Hac Vice*
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:  (317) 231-7464
Email:       jmaley@btlaw.com

Attorneys for Defendant TASER International, Inc.

## CERTIFICATE OF SERVICE

The above signed hereby certify that a copy of the foregoing was served this 25th day of February, 2011, through the Court's ECF system to all counsel of record.

INDS02 MCR 1153486v1

35