# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:10cv125-RJC-DCK

| | |
|---|---|
| **TAMMY LOU FONTENOT, as** ) | |
| **Administratrix of the Estate of DARRYL** ) | |
| **WAYNE TURNER, deceased** ) | |
| ) | **ORDER** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **TASER INTERNATIONAL, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court upon TASER International, Inc. (TASER)'s Motion

for Summary Judgment (Doc. No. 33) seeking dismissal of all Plaintiffs claims against it.

TASER has also filed <u>Daubert</u> motions with respect to four of Plaintiff's expert witnesses.  (Doc.

Nos. 35, 37, 38, 41).  All of these motions have been fully briefed by each side and are now ripe

for adjudication.  For the reasons discussed below, TASER's motion for summary judgment is

GRANTED in part and DENIED in part, and TASER's motion to exclude the testimony of Dr.

Zipes is DENIED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

On March 20, 2008, 17-year old Darryl Turner died shortly after being hit in the chest

with a TASER Model X26 electrical control device (ECD).[2]  Earlier that day, Turner, a bagger-

---

[1] Unless otherwise noted, these facts are drawn from the Complaint and the evidentiary material
of record.  Because TASER is seeking summary judgment, all factual disputes have been resolved in
favor of Fontenot, as the party resisting summary judgment.

[2] The TASER X26 uses propelled wires (as was done here) or direct contact to conduct energy to
affect the sensory and motor functions of the nervous system.  Using a replaceable cartridge containing
compressed nitrogen, it deploys two small probes that are attached to the TASER X26 by insulated
conductive wires.  It transmits electrical pulses along the wires and into the body affecting the sensory
and motor functions of the peripheral nervous system.  The energy can penetrate up to two inches of
clothing, or one inch per probe.  (Doc. No. 43-7D: TASER Operating Manual MMU0004 Rev. B).

cashier at a Food Lion supermarket in Charlotte, was confronted about stealing food from the store and ultimately fired for insubordination. Turner refused to leave the store, so the Customer Service Manager, who was shaken by Turner's "confrontational and defiant" behavior toward her, placed a 911 call to police requesting his removal. (Doc. No. 45-5 at 2-3: Declaration of Mary Blackert).

When Officer Jerry Dawson of the Charlotte Mecklenburg Police Department (CMPD) arrived on the scene, he found Turner yelling and cursing at the Store Manager and was concerned that Turner was going to hit him. (Doc. No. 44-5 at 76: Deposition of Officer Dawson). Prior to Officer Dawson's arrival, Turner had shoved a Western Union display off the counter, which hit the wall next to the manager, threw an umbrella at the manager, and advanced upon the manager, who had retreated behind the counter.[3] The manager states that he was "fearful of my own safety and of those around me." (Doc. No. 45-6 at 3: Declaration of Antwan A. Wesley). Officer Dawson issued some kind of command to Turner, and although the witnesses have different recollections of what exactly was said,[4] it is undisputed that when Turner moved towards Officer Dawson, the officer fired his X26 ECD. While the ECD was discharging, Turner continued to walk forward, and he grabbed a small rack and threw

_____

[3] These events are portrayed in excerpts from Food Lion Surveillance Video. Although the video provides an overall impression of the incident, its poor quality and lack of audio mean that it does not completely resolve what occurred between Turner, the Food Lion managers, and Officer Dawson.

[4] One witness recalls Officer Dawson saying to Turner, "Take one step back" and Turner complying (TASER Ex. 45 at ¶4), another describing him saying, "Don't move any more. This is your last warning before I TASER you" (TASER Ex. 27 at ¶4), another reporting that the Officer said "What are you looking at me like that for" (TASER Ex. 44 at ¶3), the store manager reporting that the officer "was saying something like 'calm down son' or 'calm down sir'" (TASER Ex. 26 at ¶9); and the service manager recalling that the officer was telling Turner to calm down and said, "Darryl, don't make me have to do this,"(TASER Ex. 25 at ¶9).

it to the floor.  Then Turner collapsed on the floor, never to rise again.[5]  As a readout on the

ECD reflects, the trigger of the ECD had been held down continuously for 37 seconds.[6]  Officer

Dawson testified that Turner was walking for all of those 37 seconds except for the precise

moment when he fell, after which Dawson let go of the trigger.  (Doc. No. 55-1 at 22: Dawson

Deposition).

A second officer, Joseph Pryor, arrived right after Turner collapsed, and he ordered

Turner to put his hands behind his back for cuffing.  Turner did not move, but Officer Dawson

thought that he might have been "playing possum," so Dawson gave him another shock, this

time for the standard five-seconds.  (Doc. No. 59 at 11).  Plaintiff alleges that at some point

while Turner was being tased, he went into ventricular fibrillation (VF), the lethal arrhythmia

caused by electric shock.  Firefighters and paramedics arrived, but despite CPR and defibrilation,

Turner was not revived and was later pronounced dead at the hospital.

### A.     Cause of Death

An autopsy was conducted by the Mecklenburg County medical examiner's office.  The

autopsy report detailed that taser barb marks were located near the mid sternum of the chest and

the epigastric area of the abdomen.  It further states that "there are no anatomic findings

indicating an obvious pre-existing cardiac abnormality or disease," and that there was no cocaine

or other organic bases detected in the toxicology analysis.  The autopsy did not test for all drugs,

---

[5] Turner's collapse cannot be seen on the surveillance videos because it occurred directly below two cameras pointing at the front doors.  (Doc. No. 59 at 10).

[6] The X26 ECD trigger activates a 5-second cycle, which is stopped by moving the safety lever to the safe position.  Holding the trigger down continues the discharge beyond five seconds.  Each X26 ECD contains data download capabilities that record the date, time, and duration for each trigger pull.  See (Doc. No. 34 at 7).

however, such as THC, PCP, or methamphetamine. Ultimately, the medical examiner determined that Turner's death was caused by "Acute Ventricular Dysrhythmia, Agitated State, Stress, and Use of Conducted Energy Weapon Device (Taser)." The medical examiner found that this lethal disturbance in Turner's heart rhythm was precipitated by his agitated state and associated stress as well as the use of a conducted energy weapon. However, the report concludes by quoting from a June 2008 NIJ Interim Report stating that "there is no conclusive medical evidence within the state of current research that indicates a high risk of serious injury or death from the direct effects of [Conducted Energy Weapon Device] exposure." The examiner later testified that "I guess based on the totality of evidence that's out there, there's no proof that [the electrical current from the ECD reached Turner's heart and resulted in dysrhythmia.]" (Doc. No. 44-3 at 148-149: Deposition of Owens).

**B.    CMPD's Suspension of Officer Dawson**

Officer Dawson's deployment of the ECD was reviewed by the CMPD Review Board, which stated: "After a thorough review of the evidence, the Board determined that the initial decision to discharge the TASER was within our procedures, but the prolonged use of the TASER was not." (Doc. No. 45-12). The Review Board also noted that Officer Dawson had been suspended for five days and would receive additional training concerning the use of the TASER ECD.

**C.    Plaintiff's Claims**

On February 8, 2010, Plaintiff filed this action against TASER in Mecklenburg County Superior Court, which TASER removed to federal court based on diversity jurisdiction. Plaintiff seeks recovery from TASER in Product Liability, alleging that TASER failed to issue warnings and distributed defective training products after it received scientific test results demonstrating

that the X26 ECD's current, when applied to the chest near the heart, has the capacity to

"capture" heart rhythm and thus cause sudden death.  Plaintiffs have settled with the County of

Mecklenburg.

### C.     TASER's Warning and Training Materials

Although CMPD conducted its own training, TASER provided it with a substantial

amount of warning and training materials including a training CD/DVD, current warnings, and

an Operating Manual.  The X26 ECD that was used on Turner was shipped on April 24, 2006.

(Doc. No. 58-1 at 18: Packing Slip).  When CMPD first purchased X26 ECDs in 2003, TASER

provided its Version 10 materials.  As updates or new versions of these materials came out, or as

new product information or training bulletins were issued, TASER forwarded these materials to

all TASER-certified instructors in its database.  According to CMPD Captain Michael

Campagna, when CMPD receives TASER bulletins, it (not TASER) decides whether they

impact CMPD policy and how to address them.  (Doc. No. 44-7 at 43-44: Deposition of

Campagna).  Nevertheless, Campagna also states that CMPD simply used TASER's materials in

its initial training of CMPD officers, passing on to the officers the representations that it had

received from TASER that the electrical current from the X26 would not affect heart rhythm.

Accordingly, CMPD did not teach there was increased risk from firing darts into the chest.  Id. at

23-26.

The warnings in effect at the time of the incident included TASER's Version 10-14

training materials.  The relevant warnings state, (with all emphases added):

> WARNING: READ BEFORE USING
> The TASER X26 is a *less-lethal weapon*. It is designed to incapacitate a target from a safe
> distance without causing death or permanent injury. While the extensive medical evidence
> strongly supports the TASER X26 will not cause lasting aftereffects or fatality, it is
> important to remember that the very nature of physical confrontation involves a degree of

risk that someone will get hurt or may even be killed due to unforeseen circumstances and individual susceptibilities. Accordingly, the TASER X26 should be treated as a serious weapon and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk. Law enforcement customers are deployment and tactical experts and will determine all deployment and tactical practices including where the TASER X26 fits in their respective use of force continuum.

\*\*\*

TASER tests have found: *no effect on heart rhythms*... No long-term effects – The electrical outputs are still well within the safe levels defined by international standards.

\*\*\*

• The ADVANCED TASER M26 was applied *directly to the chest* of test animals ... without heart failure

• Using "worst case" scenarios, two cardiac safety experts found *no interference by the M26 with heart rhythms*

• No interference occurred when the animal subjects were given dangerous drugs (epinephrine and drugs similar to PCP and cocaine) that make the heart more susceptible to electrical stimulation

(Doc. No. 45-13 & Doc. No. 58-1, Exs. 103 & 104: Version 10 training materials). Versions 13 and 14 included illustrations that uncritically portrayed a police officer firing at the chest of a subject. (Doc. No. 58-1, Exs. 105, 106, 107, 108). Another slide instructs users to "Aim like a standard firearm at center of mass." (Doc. No. 59-3, Ex. 122). Although some slides instructed users to "consider targeting the waist area," at close range or to deploy at suspect's back, these were for reasons of enhanced effectiveness and not safety.

In June 2005, TASER issued Training Bulletin No. 12 regarding continuous, repeated, or extended duration applications. (Doc. No. 46-5). Captain Campagna states that he reviewed TASER Bulletin 12 by October 2005, and he affirms that everyone in the department would have been reviewing it and acknowledging it around that time as well. (Doc. No. 44-7 at 34). CMPD

also created its own internal advisory document that quotes from the 3-page bulletin (Doc. No. 46-7: CMPD TASER Tactical Training), which provides in part:

> Subject: Restraint during TASER™ System Application
>
> ... TI training has long encouraged that device operators consider the TASER system application as a *"5¬second 'window of opportunity,"* during which time an arrest team can begin restraint procedures. However, it has come to our attention that there may be a training issue where arrest teams are avoiding touching the subject during the TASER device application.
>
> 1. It is important to emphasize that arrest teams can handle the subject during TASER system application. Failure to begin restraint procedures during a TASER device application can unnecessarily prolong the duration or number of TASER device applications administered to a given subject.
>
> 2. *Repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration, particularly when the probes are placed across the chest or diaphragm*. Users should avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period.
>
> 3. Particularly when dealing with persons showing symptoms of excited delirium, use of the TASER system should be combined with physical restraint techniques to minimize the total duration of the struggle and minimize the total duration of TASER system stimulation....
>
> 4. ... It is important, however, that the user focus on the TASER device induced impairment as a window of opportunity during which physical restraint procedures should be initiated whenever practicable.
>
> 5. If circumstances preclude restraint procedures during TASER system application, such as a single officer acting alone: a. The user should attempt to minimize the uninterrupted duration and total number of TASER device applications . . . .
>
> ***
>
> 7. As with any use of force or restraint tool, technique or device, the use of a TASER device upon a person . . . may be stressful and contribute to exertion or exhaustion, including injury or death caused by an individual's exhaustion or over-exertion. Repeated, prolonged, and/or continuous TASER device exposure(s) may contribute to or cause cumulative exertion or exhaustion results or effects.

(Doc. No. 46-5 at 1-2). Thereafter, TASER provided CMPD with additional warnings on

extended duration applications. TASER's September 28, 2005 Product Warnings document

provides in part:

> Any use of force . . . carries with it risks of injury or even death. To minimize these risks:
> 8. When practicable, avoid prolonged or continuous exposure(s) to the TASER device electrical discharge. The stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s). Severe exhaustion and/or over-exertion from physical struggle, drug intoxication, use of restraint devices, etc. may result in serious injury or death. * * * If a person's system is already compromised by over-exertion, drug intoxication, stress, pre-existing medical or psychological condition(s), etc., any physical exertion, including the use of a TASER device, may have an additive effect in contributing to cumulative exhaustion, stress, *cardiovascular conditions*, and associated medical risk(s). To minimize the risk of injury, consider the following:
>
> ***
>
> b. If a TASER device application is ineffective in achieving the desired effect, consider reloading and redeploying or using other force option(s).
>
> c. If a subject is exhibiting signs or behaviors (such as extreme agitation, bizarre behavior, inappropriate nudity, imperviousness to pain . . .) that are associated with Sudden In-Custody Death Syndrome, consider combining use of a TASER device with immediate physical restraint techniques and medical assistance.
>
> 9. No weapons system, tool, or technique is effective in 100% of deployments. Consider acceptable options, alternatives, and backup plans in case of ineffective deployment when deploying, activating, or otherwise using a non-lethal weapon, including TASER devices.

(Doc. No. 46-6: TASER Product Warnings – Law Enforcement). In 2006, TASER issued the

next version of its Product Warnings document, which repeated the general warning regarding

injuries or death and included the following specific warnings:

> Control and Restrain Immediately. Begin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the subject.
> Continuous Exposure Risks. When practical, avoid prolonged or continuous exposure(s) to the TASER device's electrical discharge. *In some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion,*

8

*stress, and associated medical risk(s).*

(Doc. No. 43-7, Ex B at 2-3).

## II.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.   ANALYSIS

### A.    Plaintiff's Claims based on TASER's Warnings and Training Materials

Plaintiff seeks to hold TASER liable in negligence for failure to adequately warn about the cardiac risks of X26 shots to the chest. This claim is governed by the North Carolina Product Liability Act. See N.C.G.S § 99B-5. Although Plaintiff now asserts that TASER's training materials are actually separate "products" that were inadequately designed and should therefore be analyzed under the section of the act dealing with inadequately designed products (§ 99B-6) instead of the section dealing with inadequate warning or instruction (§ 99B-5), there was no mention or implication of a "design defect" anywhere in Plaintiff's complaint. To the contrary, the two paragraphs of the Complaint cited by Plaintiff, nine and fourteen, speak only of failures to train, instruct, and/or warn. Moreover, Plaintiff's claims about TASER's training materials are clearly encompassed by the plain language and purpose of N.C.G.S. § 99B-5. Accordingly, this Court will not attempt to squeeze a square peg into a round hold by analyzing TASER's training materials under a design defect framework; rather, it will analyze all of Plaintiff's claims about the inadequacy of TASER's warnings, including those warnings contained in the training materials, under § 99B-5.

It is well established that a manufacturer has a duty to "properly inform users of a product's hazards, uses, and misuses or be liable for injuries resulting therefrom under some circumstances." Edwards v. ATRO SpA, 891 F.Supp. 1074, 1077 (E.D.N.C.1995) (quoting Smith v. Selco Products, Inc., 96 N.C.App. 151, 156, 385 S.E.2d 173 (1989)). Under the North Carolina Product Liability Act, no manufacturer or seller of a product shall be held liable in an action based upon inadequate warning or instruction unless the claimant proves: 1) that the manufacturer or seller acted unreasonably in failing to provide such warning or instruction; 2)

that the failure to provide adequate warning or instruction was a <u>proximate cause</u>[7] of the claimant's harm; and 3) that the manufacturer or seller knew or should have known that the product created an <u>unreasonably dangerous condition</u> when it left the control of the manufacturer or seller *or* that the manufacturer or seller became aware (or should have become aware), after the product left its control, that the product posed a substantial risk of harm but failed to take reasonable steps to give adequate warning or instruction. <u>See</u> N.C.G.S. §99B5(a) (emphasis added). Chapter 99B does not adopt the doctrine of strict liability. Thus, the essential elements for a products liability claim are based upon negligence and include "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach; and (4) loss because of the injury." <u>Driver v. Burlington Aviation, Inc.</u>, 110 N.C. App. 519, 527 (citations omitted).

Plaintiff's core claim is that TASER manufactured and sold its X26 ECDs without adequate warnings or instruction for use. As a result, Plaintiff contends, Turner suffered cardiac arrest while the active current from a TASER Model X26 was passing through his heart. Plaintiff argues that a simple warning about this known cardiac risk, and a simple instruction to avoid chest shots – rather than the contrary instruction to target "center body mass" – would have eliminated the risk and spared Turner's life. TASER alleges that they did not fail to provide adequate warning, and that in any case, any failure to warn was not, as a matter of law, the proximate cause of plaintiff's injuries. The second contention should be examined first.

### i.    *Causation*

---

[7] "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injures, and without which the injuries would not have occurred." <u>DeWitt v. Eveready Battery Co., Inc.</u>, 144 N.C.App. 143, 153 (N.C.App.,2001) (<u>quoting</u> <u>Hairston v. Alexander Tank & Equip. Co.</u>, 310 N.C. 227, 233 (1984).

First, Plaintiff must establish a link between the inadequate warning and the resulting injury. See N.C.G.S. § 99B-5(a); Smith v. Wyeth-Ayerst Labs. Co., 278 F. Supp.2d 684, 706 (W.D.N.C. 2003) (holding that a products liability plaintiff asserting a failure to warn claim must show that the injury was caused by the defendant's failure to warn). TASER argues Plaintiff has failed to raise a triable issue that different warnings would have resulted in a different outcome primarily because Officer Dawson declined to say whether he would still have used the X26 ECD if he had thought that it could cause Turner to stop breathing and go into cardiac arrest. (Doc. No. 44-5 at 11, saying, "I can't speculate"). Plaintiff responds that a jury could still infer "that Officer Dawson would not have shot his X26 into this young man's chest, knowing the risk of cardiac arrest could have been eliminated by firing lower." (Doc. No. 59 at 29).

There is ample evidence linking Officer Dawson's actions to TASER's warnings and instructions. For example, when asked about his training with respect to aiming a TASER ECD in probe mode, Officer Dawson testified:

> Q.  Did you notice that the light [of the laser] was illuminated sort of right in the center of his chest?
> A.  Yes. That's where I aimed. . . . .
> Q.  Were you taught -- were you trained to aim at center of body mass?
> A.  Yes.
> Q.  Just like a firearm?
> A.  Yes.

(Doc. No. 55, Ex. 7). The potential effects of TASER's failure to warn about probes in the chest became apparent when Officer Dawson was asked whether he appreciated any risk:

> Q.  When you fired on this occasion did you believe that it was perhaps going to be more dangerous because you were firing at the center of the chest rather than some other part of the body?
> A.  No.
> Q.  When you fired at his chest, did you have any reason to believe that the taser administration was possibly going to kill him or at least cause a cardiac arrest?
> A.  No. . . . .

> Q.     When you pulled the trigger, at that moment, your state of mind, did you believe that the taser could not cause a cardiac arrest?
>
> A.     That was my belief.

Id. Even as Turner lay motionless on the Food Lion floor, the officer did not realize what the X26 had done.

> Q.     You did not think that he had perhaps collapsed in cardiac arrest or some condition like that because of the taser?
>
> A.     No.
>
> Q.     Because you believed - is it correct you believed that the taser could not cause that kind of injury?
>
> A.     It didn't cross my mind at that time that that would happen.

Id. Officer Dawson was shocked when Officer Pryor told him that Turner was not breathing.

> Q.     Did that just hit you like a bolt out of the blue?
>
> A.     I was shocked.
>
> Q.     You were shocked?
>
> A.     Yes.
>
> Q.     Was it your belief up to that point in time that the taser device could not have caused that?
>
> A.     Yes.

On the flip side, there is no indication that even with a different warning, Dawson would still have fired darts at Turner's chest area.  That distinguishes this case from DeWitt v. Eveready Battery, 550 S.E.2d 511, 518 (N.C. Ct. App. 2001) (finding that because Plaintiff did not realize that he had been exposed to battery fluid until after he sought treatment at the hospital, his injuries would have occurred even if the warnings on the batteries had been more conspicuous).  Thus – assuming for now that the X26 current did affect Turner's heart rhythms – a reasonable jury could conclude that a different warning would have resulted in a different outcome.  Whether this conclusion constitutes unsupported speculation does not hinge on Officer Dawson's refusal to speculate one way or another.

This Court next turns to the issue of general and specific causation.  General causation in

this context concerns whether the product is capable of causing the alleged injury, while specific causation concerns whether the product actually caused the injury. See Doe v. Ortho-Clinical Diagnostics, Inc., 440 F.Supp.2d 465, 461 (M.D.N.C. 2006). In a complex product liability case such as this, a plaintiff must present expert medical testimony to establish causation. See Driggers v. Sofamor, S.N.C, 44 F.Supp.2d 760, 764-65 (M.D.N.C. 1998) (holding that "where the injury is complicated, such as a back injury, expert medical testimony on the issue of causation must be provided to support a jury award"); Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 167 (1980) (finding that "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury") (citations omitted). When a plaintiff is unable to establish general causation, it is unnecessary to consider whether he or she can establish specific causation. Doe, 440 F.Supp.2d at 476 (citing Dunn v. Sandoz Pharms. Corp., 275 F.Supp.2d 672, 676 (M.D.N.C. 2003).

TASER argues that Plaintiff fails to establish general causation because Plaintiff has adduced no evidence that ECDs cause VF in humans. (Doc. No. 34 at 30). In fact, alleges TASER, the premier experts in forensic pathology, cardiovascular pathology, ECD research, and emergency medicine have all concluded that an ECD application "has not been shown to cause sudden death in humans." See (Doc. No. 34 at 32). In order to prove her claims, Plaintiff has designated several medical and technical experts to testify on the hotly contested liability issues in this case. On the causation issue, Plaintiff offers testimony from Dr. Douglas Zipes regarding, among other things, the medical cause of Turner's cardiac arrest and sudden death. TASER moves to exclude Dr. Zipes's opinion testimony, which will be considered in tandem with the

present motion for summary judgment.[8]

### 2) TASER's Motions to Exclude Expert Testimony

Although state law controls the substantive tort issues in this diversity action, the admissibility of expert testimony is governed by federal law. See Snoznik v. Jeld-Wen, Inc., L 1924483, 4 -5 (W.D.N.C. 2010) (citing Bryte ex rel. Bryte v. Am. Household, Inc., 429 F.3d 469, 476 (4th Cir.2005)). Rule 702 of the Federal Rules of Evidence permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable. See Fed.R.Evid. 702. The trial judge must act as a gatekeeper, admitting only that expert testimony which is relevant and reliable. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). Testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, which means that is must be "tied to the facts of the particular case." Daubert 509 U.S. at 591.

With regard to scientific knowledge, the trial court initially must determine whether the reasoning or methodology used is scientifically valid and is applied properly to the facts at issue in the trial. Id. at 589. To aid the Court in this gatekeeping role, the Supreme Court has identified several key considerations, including whether the expert opinion can be tested; whether it has been subjected to peer review; the error rate of the methods that the expert employed; the existence and maintenance of standards used in the expert's methods; and whether the expert's methods are generally accepted in the scientific community. Id. at 592-94; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir.2005). The objective of Daubert's

---

[8] This Court declines to rule on TASER's three other motions to exclude expert testimony at this time because they are not essential to this court's resolution of the summary judgment motion.

gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The Court has broad discretion in determining whether the Daubert factors reasonably measure reliability in a given case. Id. at 153.

Here, Dr. Zipes is qualified to provide expert opinion testimony regarding causation. Zipes is board-certified in internal medicine and cardiovascular diseases and was board-certified until 2005 in clinical cardiac electrophysiology. He is Emeritus Director of the Cardiology Division and Professor of Medicine at Indiana University, former Director of the Division of Cardiology at the Krannert Institute of Cardiology, and author of over 800 medical articles and 21 textbooks, including textbooks on eletrophysiology. Dr. Zipes is a member of the editorial boards of more than 15 cardiology journals, was the founding Editor-in-Chief of the *Journal of Cardiovascular Electrophsiology*, and the founding Editor-in-Chief of *HeartRhythm*, the number-one specialty cardiology journal in the world. He received his medical degree *cum laude* from Harvard Medical School and completed his residency in internal medicine and cardiology at Duke University Medical Center.

Zipes has concluded that "X26 discharge can cause cardiac arrest by capturing the cardiac rhythm at very rapid rates, and precipitating ventricular tachycardia or ventricular fibrillation," which is clearly relevant as it will assist the trier of fact in understanding a central fact at issue in this particular case. See Fed. R. Evid. 702; Daubert 509 U.S. at 591. Under the Daubert factors, this conclusion is also reliable and should therefore be admitted: Zipes's conclusion can and has been tested, and it grew out of peer-reviewed research and case reports that Zipes discusses at length, and Zipes explains precisely how his conclusions were reached and points to objective

sources to ground his opinions. The fact that his "opinions are based on data collected by others is immaterial; Federal Rule of Evidence 703 expressly allows such opinion testimony." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1142 (9th Cir. 1997). Moreover, although there appears to be significantly more evidence in opposition to Zipes's conclusion than there is in support of it, this is no failing under the Daubert test, which only requires that expert testimony be intellectually rigorous, not intellectually popular. See Kumho Tire Co., 526 U.S. at 152.

In sum, the Court is satisfied that a jury – relying upon the expert testimony of Dr. Zipes that has survived TASER's Rule 702 challenge, and the evidence of what occurred upon the discharge of the X26 ECD – could conclude that the ECD can cause VF in humans as a matter of general causation and that the ECD used in this case did constitute a proximate cause of Turner's death as a matter of specific causation. TASER's remaining arguments go to the weight and conclusiveness of Plaintiff's evidence, but do not eliminate the genuine issues of material fact.

### 3. Reasonableness

Plaintiff must also show that TASER acted unreasonably in failing to provide appropriate warnings, and that they knew or should have known that the failure to provide adequate warnings created an unreasonably dangerous condition, or if TASER became aware (or should have become aware), after the X26 ECD left its control, that it posed a substantial risk of harm to a reasonably foreseeable user or consumer, that they later failed to take reasonable actions under the circumstances. N.C.G.S. §99B5(a). TASER argues that 1) its warnings were not defective because it repeatedly warned against prolonged, extended ECD applications; and 2) that it neither knew nor should have known of an unreasonably dangerous condition in its ECD or warnings. (Doc. No. 34 at 22-24).

17

Plaintiff does not directly dispute that TASER warned against repeated, extended ECD exposures but argues that this refers "to a different risk – impairment of breathing," and "focuses on the duration of the exposure ... rather than the location of the darts." (Doc. No. 59 at 22). As outlined above, one of TASER's Product Warnings did in fact reference cardiovascular conditions, but it was along with an array of other risks from prolonged exposure to people whose systems are "already compromised," and did not connect any cardiovascular risks to the location of the darts. See (Doc. No. 46-6). Moreover, the materials included slides with vivid illustrations that uncritically portrayed a police officer firing at the chest of a subject. (Doc. No. 58-1, Exs. 105, 106, 107, 108). Another slide instructs users to "Aim like a standard firearm at center of mass." (Doc. No. 59-3, Ex. 122). Version 14 included a slide that states: "Current human studies have concluded that TASER applications directly across the chest do not impair normal breathing patterns." (Doc. No. 58-2). Moreover, Plaintiff provided evidence that CMPD instructed its officers that the X26 should be fired at center body mass, that shots to the chest are not dangerous, that the current cannot affect heart rhythm, and that there was no risk from prolonged or repeated exposures to the chest. See (Doc. No. 55-1 at 42: Campagna Depo[9]). TASER markets its product as a less-lethal tool that is safe to aim at the chest. Consequently, a reasonable jury could conclude that an X26 ECD that caused a death under the factual scenario presented here had an unreasonable "warnings" defect and was in an unreasonably dangerous

---

[9] Plaintiff's discussion of reasonableness, like other portions of its brief, fails to discuss any case law beyond distinguishing the cases cited by TASER. Moreover, it was cumbersome for this Court to verify Plaintiff's citations to her exhibits and depositions because they were all combined into just a few documents, without an easy way to navigate to the referenced portions. The Court should not have to scour the Plaintiff's submissions and shoulder the burden of conducting the legal research in order to evaluate her claims. See Walker v. Prince George's County, 575 F.3d 426, 429 n.1 (4th Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs").

condition.  TASER will have the opportunity to argue to a jury that its warnings were not defective, and the jury may agree, but the record does not permit this Court to so find as a matter of law.

However, "to prove a product defective is one thing; to prove that the defect flowed from a failure to exercise reasonable care is quite another."  See, e.g., Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.,  138 N.C.App. 70, 75 (N.C.App. 2000) (quoting 1 Products Liability § 4.7, at 127).  A manufacturer must inform itself about what safety designs and methods are available in its industry and is under a duty to make reasonable tests and inspections to discover any latent hazards, Morgan v. Cavalier Acquisition Corp., 111 N.C.App. 520, 528 (N.C.App.1993); Smith, 96 N.C.App. at 156; Jenkins v. Helgren, 26 N.C.App. 653, 217 S.E.2d 120 (1975), but it is not responsible for "consequences which are merely possible according to occasional experience." Keintz v. Carlton, 96 S.E.2d 14, 18 (1957).  Thus, the last piece of this analysis is whether TASER knew or should have known that the inadequacy of its warning or instruction created an unreasonably dangerous condition.

To this end, Plaintiff alleges that two cardiac electrophysiologists performing TASER-funded research reported before April 24, 2006 (the date TASER shipped Officer Dawson's X26) that "avoidance" of chest shots would lower the risk of "ventricular arrhythmia," the immediate cause of Turner's death according to Plaintiff.  Plaintiff also cites publications in the *New England Journal of Medicine*, the *Journal of the American College of Cardiology*, the *Journal of Trauma*, and the *Journal of Cardiovascular Electrophysiology*, all published before Turner's death, that address the potential dangers of electric discharges through darts to the front of the chest.  See (Doc. No. 59 at 12-14).  TASER distinguishes every single one of these studies. However, taken in the light most favorable to Plaintiff, this evidence could be sufficient to

19

establish that TASER should have known that without including a warning or instructions about avoiding chest shots, the X26 ECD was in an unreasonably dangerous condition. TASER is therefore not entitled to summary judgment on Plaintiff's claims based on inadequate warning or instruction under N.C.G.S. § 99B-5.

**B.    TASER's Defenses**

TASER contends that Plaintiff's claim is barred by the officer's misuse of the weapon and by Turner's own contributory negligence, which are complete statutory defenses in North Carolina. These defenses are codified in N.C. Gen. Stat. 99B-4, which states:

No manufacturer or seller shall be held liable in any product liability action if:

(1) The use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings; or

***
(3) The claimant failed to exercise reasonable care under the circumstances in the use of the product, and such failure was a proximate cause of the occurrence that caused the injury or damage complained of.

As the Supreme Court of North Carolina has said, N.C.G.S. § 99B-4(1) and (3) "merely codify the common law doctrine of contributory negligence" as it applies in products liability actions. Nicholson v. American Safety Utility Corp., 346 N.C. 767, 772 (1997) (quoting Champs Convenience Stores, Inc. v. United Chemical Co., 329 N.C. 446, 452 (1991). "In addition to codifying the general doctrine of contributory negligence, § 99B-4 sets out or explains more specialized fact patterns which would amount to contributory negligence in a products liability action." Id.

Upon the evidence in this case, TASER has not established contributory negligence as a matter of law. Issues of contributory negligence, like those of ordinary negligence, are ordinarily questions for the jury and are rarely appropriate for summary judgment. See Lamm v. Bissette Realty, Inc., 327 N.C. 412, 418, 395 S.E.2d 112, 116 (1990); see also, Smith, 96 N.C.App at 155 (stating that "it is widely acknowledged that certain claims or defenses are not well suited for summary judgment. For example, summary judgment is rarely appropriate in a negligence case). Only where the evidence establishes the plaintiff's own negligence so clearly that no other reasonable conclusion may be reached is summary judgment to be granted. Norwood v. Sherwin-Williams Co., 303 N.C. 462, 468-69, 279 S.E.2d 559, 563 (1981).

The fact that Officer Dawson used the product contrary to some of TASER's warnings does not establish contributory negligence as a matter of law because there is still an issue here as to whether the warnings were adequate. In Smith, 96 N.C.App. 151, the Court of Appeals of North Carolina reversed the granting of summary judgment for the defendant manufacturer on the basis of contributory negligence under § 99B-4 where the plaintiff had failed to obey a cautionary decal affixed to a cardboard box baler by reaching his arm into the machine while it was operating, which resulted in his arm being ripped off. Even though the plaintiff had violated an express product warning, the court found that it was improper to hold him contributorily negligent at the summary judgment stage for failure to heed the warning because there was evidence that the design and warnings of the baler may have been defective. Id. at 158. Likewise, the court found that the question of whether claimant's behavior was reasonable "under the circumstances" should have gone to the jury. Id. at 159-60.

Here, the Plaintiff has presented evidence that the TASER's instructions were not adequate, so TASER is not entitled to summary judgment on the basis of Officer Dawson's misuse.  See Smith, 96 N.C. App. 151; Bryant v. Adams, 116 N.C.App. 448, 472 (N.C.App.1994) (holding that "if the instructions themselves were not adequate or if the plaintiff did not read the instructions but the jury determined that the plaintiff still exercised reasonable care, a plaintiff should not be found contributorily negligent).  As for general contributory negligence, TASER has simply not established the basic elements of a negligence claim against Turner (duty, breach, cause, harm), and TASER's contention that Turner is negligent per se because he may have engaged in criminal behavior is without a legal basis.  In fact, even the case that TASER cites in an attempt to establish support for their negligence per se claim acknowledges that negligence per se occurs when a statute "imposes upon a person a specific duty for the protection of others." Goodman v. Wenco Foods, Inc., 423 S.E.2d 444 (N.C. 1992).  Yet TASER has made no allegation that Turner was under a special statutory duty for the protection of others.  For all of these reasons, TASER is not entitled to summary judgment on its affirmative defenses.

### C.    Punitive Damages

In North Carolina, the standard for recovery of punitive damages is, in relevant part, as follows:

   (a)    Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:

   (1)    Fraud.
   (2)    Malice.
   (3)    Willful or wanton conduct.

   (b)    The claimant must prove the existence of an aggravating factor by clear and convincing evidence.

N.C.G.S. § 1D-15(a)-(b).  "Punitive damages are recoverable in a negligence action only upon a showing that the negligence was gross or wanton" – that is, done with "conscious and intentional disregard" of the safety of others.  Edwards, 891 F.Supp. at 1081.  In her Motion in Opposition to Summary Judgment (Doc. No. 59), Plaintiff "respectfully suggests that the Court decide after hearing plaintiff's evidence at trial whether the jury should consider punitive damages."  The Court declines the offer.  At this stage, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Even in the light most favorable to Plaintiff, it has not set forth clear and convincing evidence to support a finding of willful or wanton conduct that demonstrates conscious and intentional disregard of the safety of others, so there is no genuine issue of material fact in dispute.  Summary judgment is therefore granted on the punitive damages claim.

**IT IS, THEREFORE, ORDERED THAT:**

1. TASER's Motion for Summary Judgment (Doc. No. 33) is **GRANTED** on the claim for punitive damages and **DENIED** on all other claims, as described herein**.**

2. TASER's Motion to Exclude Dr. Douglas Zipes's Causation Opinions (Doc. No. 35) is **DENIED.**

Signed: June 24, 2011

Robert J. Conrad, Jr.
Chief United States District Judge