# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:10-cv-125-RJC-DCK

TAMMY LOU FONTENOT, as )
**Administratrix of the Estate of DARRYL** )
**WAYNE TURNER, deceased** )
)
          **Plaintiff,** )
v. )          **ORDER**
)          **NUNC PRO TUNC**
**TASER INTERNATIONAL, INC.,** )
)
          **Defendant.** )
_____ )

**THIS MATTER** comes before the Court on Plaintiff Tammy Lou Fontenot's

("Plaintiff") Declaration, (Doc. No. 171), and Defendant's response, (Doc. No. 172).

On March 27, 2012, this Court entered an Order granting in part and denying in part

TASER International, Inc.'s ("TASER") July 19, 2011 Oral Post-Trial Motion, seeking Rule 50

Judgment as a Matter of Law Not Withstanding the Verdict ("JNOV"), Rule 59 New Trial, or

Remittitur. See (Doc. No. 141). The Court denied TASER's Motion for JNOV and New Trial,

but remitted of the jury's $10 million award to $4,372,399, after deducting Plaintiff's settlement

with the City of Charlotte and workers compensation award. (Doc. No. 170).

Plaintiff's Declaration took exception to the Court's description of a certain pacemaker

study and the Court's discounting methodology used in calculating the present monetary value of

the decedent, Darryl Turner, to his parents. (Doc. No. 171). Plaintiff's arguments are well taken

on both points. The Court has amended its description of the pacemaker study at issue below.

See III.A.2. As to Plaintiff's discounting argument, the Court previously estimated that the

highest value the jury could have determined Turner to be worth to his parents over their

projected final forty years was $7.5 million. The Court erred in simply reducing this amount to a

figure that would yield $7.5 million if invested at 1% over 40 years. In Barnes v. Town of

Wilson, the North Carolina Supreme Court held that it was "erroneous" to use the entire period

of the expectancy to determine the present value of periodic income because the contemplated

payments would not have been postponed until the end of the recipient's life. 7 S.E.2d 359, 363

(N.C. 1940). Instead, the Court should have used a present value formula that took into account

the contributions Turner would have made throughout his parents' lives on a yearly basis.[1]

TASER now argues that the Court should have used North Carolina's statutory annuity

table. (Doc. No. 172) (citing N.C. GEN. STAT. § 8-47). TASER cites a 1906 North Carolina

Supreme Court case to support this method. (Id. at 3 n.1) (citing Poe v. Raleigh & A.A. L.R.

Co., 54 S.E. 406 (N.C. 1906)). However, the North Carolina Supreme Court rejected application

of the state's annuity tables in Poe and again six years later in 1912. See Ward v. North

Carolina, 76 S.E. 717, 720 (N.C. 1912); Poe, 54 S.E. at 408.

TASER's argument does, however, indicate its agreement with Plaintiff's requested

formula. The statutory annuity table that TASER offers uses the same formula that Plaintiff asks

the Court to use. The only difference is that the table uses a 6% interest rate, while Plaintiff's

calculations incorporate the Court's 1% figure. Therefore, the Court will use the parties' agreed

formula and a 1% real interest rate as the discount rate.[2]

---

[1] Plaintiff offers two methods for calculating a present value damages award. (Doc. No. 171-1). In one method, Plaintiff fixes a lump sum award for the four years between Turner's death and the date of the Court's Order and adds this amount to a present value award for 36 additional years. The Court instead uses a present value award of a 40-year annuity because this is how the parties argued the case to the jury. See (7/18 Tr. at 1403-04; 1455-56).

[2] Plaintiff argued for a one percent discount value in its post-trial briefing. (Doc. No. 149 at 7). The Court used this figure in its original Order because it is a very optimistic, defense-friendly discount rate. The United States Treasury's current thirty-year constant maturity rate is only 3.38 percent while inflation is expected to approach 3 percent, leading to a 0.38% real

2

As Justice Frankfurter observed, "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Nat'l Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). Therefore, the Court has amended its March 27 Order and enters this Order in its place nunc pro tunc. For the reasons that follow, the Court **DENIES** TASER's Motion for JNOV and New Trial, but orders remittitur of the jury's $10 million award to $5,491,503.65, and if Plaintiff accepts remittitur, the Court will ultimately order judgment in that amount.

## I.    BACKGROUND

### A.    Factual Background[3]

On March 20, 2008, 17-year old Darryl Turner ("Turner") died shortly after being hit in the chest with a TASER Model X26 electrical control device ("ECD").[4] Earlier that day, Turner, a bagger-cashier at a Food Lion supermarket in Charlotte, was confronted about stealing food from the store and ultimately fired for insubordination. Turner refused to leave the store, so after contacting the store manager and observing Turner's defiant and confrontational behavior, the Customer Service Manager placed a 911 call to police to request his removal. (7/12 Tr. at 494).

---

interest rate.

[3] Unless otherwise noted, these facts are drawn from evidentiary material of record. Because TASER is seeking JNOV, new trial, or remittitur, all factual disputes have been resolved in favor of Plaintiff, as the party resisting the Motion. See Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001).

[4] The TASER X26 uses propelled wires (as was done here) or direct contact to conduct energy to affect the sensory and motor functions of the nervous system. Using a replaceable cartridge containing compressed nitrogen, it deploys two small probes that are attached to the TASER X26 by insulated conductive wires. It transmits electrical pulses along the wires and into the body affecting the sensory and motor functions of the peripheral nervous system. The energy can penetrate up to two inches of clothing, or one inch per probe. (Doc. No. 43-7D: TASER Operating Manual MMU0004 Rev. B).

3

When Officer Jerry Dawson ("Officer Dawson") of the Charlotte Mecklenburg Police Department ("CMPD") arrived on the scene, he found Turner yelling and cursing at the Store Manager and was concerned that Turner was going to hit him. (7/11 Tr. at 118). Prior to Officer Dawson's arrival, Turner had shoved a Western Union display off the counter, which hit the wall next to the manager, threw an umbrella at the manager, and advanced upon the manager, who had retreated behind the counter. At trial, the manager testified that he was concerned for his safety, and for the safety of others around him. (7/15 Tr. at 1137). Officer Dawson issued some kind of command to Turner, and although the witnesses have different recollections of what exactly was said,[5] it is undisputed that when Turner moved towards Officer Dawson, the officer fired his X26 ECD. While the ECD was discharging, Turner continued to walk forward, and he grabbed a small rack and threw it to the floor. Then Turner collapsed on the floor, never to rise again.[6] As a readout on the ECD reflects, the trigger of the ECD had been held down continuously for 37 seconds.[7] Officer Dawson testified that Turner was walking for all of those 37 seconds except for the precise moment when he fell, after which Dawson let go of the trigger.

---

[5] One witness recalls Officer Dawson saying to Turner, "Take one step back" and Turner complying (TASER Ex. 45 at ¶4), another describing him saying, "Don't move any more. This is your last warning before I TASER you" (TASER Ex. 27 at ¶4), another reporting that the Officer said "What are you looking at me like that for" (TASER Ex. 44 at ¶3), the store manager reporting that the officer "was saying something like 'calm down son' or 'calm down sir'" (TASER Ex. 26 at ¶9); and the service manager recalling that the officer was telling Turner to calm down and said, "Darryl, don't make me have to do this,"(TASER Ex. 25 at ¶9).

[6] Turner's collapse cannot be seen on the surveillance videos because it occurred directly below two cameras pointing at the front doors. (Doc. No. 59 at 10).

[7] The X26 ECD trigger activates a 5-second cycle, which is stopped by moving the safety lever to the safe position. Holding the trigger down continues the discharge beyond five seconds. Each X26 ECD contains data download capabilities that record the date, time, and duration for each trigger pull. See (Doc. No. 34 at 7).

4

(7/11 Tr. at 125).

A second officer, Joseph Pryor, arrived right after Turner collapsed, and he ordered Turner to put his hands behind his back for cuffing. Turner did not move or respond to orders, so Officer Dawson gave him another shock, this time for the standard five-seconds. (7/11 Tr. at 127). The jury found that at some point while Turner was being tased, he went into ventricular fibrillation ("VF"), the lethal arrhythmia caused by electric shock. Firefighters and paramedics arrived, but despite CPR and defibrilation, Turner was not revived and was later pronounced dead at the hospital.

> B.     Procedural Background

After a six day trial, the jury returned a verdict in favor of Plaintiff and against TASER in the amount of $10 million. After the jury returned its verdict, TASER filed its timely Motion for JNOV under Federal Rule of Civil Procedure 50 and alternative Rule 59 Motion for New Trial or Remittitur. (Doc. No. 141). Plaintiff responded, (Doc. No. 148), TASER replied, (Doc. Nos. 149; 150), Plaintiff filed an "affidavit" in surreply, (Doc. No. 152), and TASER filed a surreply, (Doc. No. 154). The matter is now ripe for adjudication.

## II.   LEGAL STANDARD

TASER moves for a JNOV pursuant to Federal Rule of Civil Procedure 50(b), for a new trial pursuant to Rule 59(a), or, in the alternative, remittitur of the jury's $10 million verdict. (Doc. No. 141).

> A.     JNOV

"When evaluating a Rule 50(b) motion, the court does not weigh the evidence or consider the credibility of the witnesses, but must grant the motion where it finds that 'substantial evidence does not support the jury's findings.'" Trident Enters., Ltd. v. Airtronic USA, Inc., No.

01:09-cv-1355, 2011 WL 2160953, at *3 (E.D. Va. May 31, 2011) (quoting <u>Konkel v. Bob Evans Farms, Inc.</u>, 165 F.3d 275, 279 (4th Cir. 1999)).  A Rule 50(b) "motion must be granted 'if a reasonable jury could only reach one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture.'" <u>Id.</u> (quoting <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005)).  Thus, "[i]f reasonable minds could differ, [the court] must affirm the jury's verdict." <u>Pitrolo v. Cnty. of Buncombe</u>, 407 F. App'x 657, 659 (4th Cir. 2011) (citing <u>Dennis v. Columbia Colleton Med. Ctr.</u>, 290 F.3d 639, 644-45 (4th Cir. 2002)).

Although a court is "'compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them,' "a court is 'not a rubber stamp convened to merely endorse the conclusions of the jury, but rather has a duty to reverse the jury verdicts if the evidence cannot support it.'" <u>Trident</u>, 2011 WL 2160953, at *3 (quoting <u>Price v. City of Charlotte</u>, 93 F.3d 1241, 1250 (4th Cir. 1996)).  A court "will grant motion for judgment as a matter of law 'if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'"  <u>Id.</u> (quoting <u>Wheatley v. Wicomico Cnty.</u>, 390 F.3d 328, 332 (4th Cir. 2004)).  The Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  <u>Lack</u>, 240 F.3d at 259.  "Because federal courts do not directly review jury verdicts, constrained, as we are, by the Seventh Amendment, the [moving party] bears a hefty burden in establishing that the evidence is not sufficient to support the awards." <u>Price</u>, 93 F.3d at 1249.

B.    <u>New Trial</u>

Under Rule 59(a), a new trial may be granted in an action in which there has been a trial by jury "for any of the reasons for which new trials have heretofore been granted in actions at

law in the courts of the United States." FED. R. CIV. P. 59(a). "On a Rule 59(a) motion, a district court may set aside the jury's verdict and grant a new trial only if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice even though there may be substantial evidence which would prevent the direction of a verdict.'" Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 305 (4th Cir. 1998). In considering a Rule 59 motion, courts may make credibility judgments in determining the clear weight of the evidence. Knussman v. Maryland, 272 F.3d 625, 647 (4th Cir. 2001).

  C. Remittitur

  As an alternative to ordering a new trial, a court may order a remittitur. "Remittitur, which is used in connection with [Rule 59(a)], 'is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award.'" Cline, 144 F.3d at 305 (quoting Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 593 (4th Cir. 1996)). "There is no specific provision for remittitur under the Federal Rules of Civil Procedure, but it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice." Bennett v. Fairfax Cnty., 432 F. Supp. 2d 596, 599 (E.D. Va. 2006) (citing Cline, 144 F.3d at 305). "If a court concludes that a verdict is excessive, 'it is the court's duty to require a remittitur or order a new trial.'" Id. (quoting Cline, 144 F.3d at 305). "Under the practice of remittitur, 'the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award.'" Id. (quoting Cline, 144 F.3d at 305). "The decision as to whether damages are excessive is 'entrusted to the sound discretion of the district court.'" Id. (quoting Robles v. Prince George's Cnty., 302 F.3d 262, 271 (4th Cir. 2002)).

**III. ANALYSIS**

TASER makes a number of arguments in support of its Motion. First, TASER argues that JNOV should be entered because (a) Plaintiff failed to show that TASER's conduct was a proximate cause of Turner's death and (b) Turner was contributorily negligent. (Doc. No. 141 at 21-36). Second, TASER contends that it is entitled to a new trial because "the jury verdict stems from an incomplete and inaccurate view of the law, liability evidence, and damages evidence that deprived TASER of a fair trial, and is otherwise against the weight of the evidence." (Id. at 36). Finally, in the alternative, TASER argues that the jury was impermissibly motivated by passion or prejudice in awarding the "extraordinary $10 million verdict" and moves the Court for a remittitur. (Id. at 6). The Court will address these arguments in turn.

A.    Rule 50 JNOV

1.    Contributory Negligence

Before trial, on July 5, 2011, Plaintiff moved the Court to exclude evidence and argument regarding contributory negligence. (Doc. No. 101). The Court granted this motion and barred TASER from arguing contributory negligence. (7/11 Tr. at 6-7). TASER now moves the Court to overturn its ruling, and the jury's verdict, and find that Plaintiff's action is barred as a matter of law due to his contributory negligence. (Doc. No. 141 at 21); see also Crawford v. Mintz, 673 S.E.2d 746, 749 (N.C. Ct. App. 2009) ("In North Carolina, a finding of contributory negligence poses a complete bar to a plaintiff's negligence claim").

Plaintiff's case against TASER is a products liability action. See N.C. GEN. STAT. § 99B-1(3). In North Carolina, products liability law is controlled by statute. Section 99B-4(3) provides that "No manufacturer or seller shall be held liable in any product liability action if . . . [t]he claimant failed to exercise reasonable care under the circumstances in the use of the product, and such failure was a proximate cause of the occurrence that caused the injury or

8

damage complained of." Both North Carolina courts and the Fourth Circuit have held that N.C. Gen. Stat. § 99B-4(3) "merely codif[ies] the common law doctrine of contributory negligence as it applies in products liability actions." Nicholson v. Am. Safety Util. Corp., 488 S.E.2d 240, 243 (N.C. 1997); see also Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712, 721 (4th Cir. 1995).

The North Carolina Court of Appeals has found that every products liability case involving contributory negligence has "involved the plaintiff's use of the alleged defective product." Nicholson v. Am. Safety Utility Corp., 476 S.E.2d 672, 679-680 (N.C. Ct. App. 1996) (holding that contributory negligence only relates to whether the plaintiff misused the product), rev'd on other grounds by 488 S.E.2d at 243. While the North Carolina Supreme Court reversed this opinion, it did not disagree with the Court of Appeals' finding that the plaintiff used the product in every products liability contributory negligence case. Instead, the North Carolina Supreme Court disagreed that the contributory negligence analysis focused on the plaintiff's misuse of the product. Nicholson, 488 S.E.2d at 243-44.

In Nicholson, the plaintiff was electrocuted while working on a power line and sued the manufacturer of the gloves he was wearing. The defendant alleged that the plaintiff was contributorily negligent in failing to wear a helmet at the time. The plaintiff argued that the court should only consider whether the plaintiff was reasonable in how he used the gloves. The Supreme Court disagreed, holding that "all of the circumstances during the plaintiff's use of the product must be considered, not just the plaintiff's conduct with respect to the product itself." Id. at 244.

A divided panel of the Fourth Circuit echoed this holding in Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712, 721-22 (4th Cir. 1995) (Wilkinson, J. dissented). There, the

Circuit held that Section 99B-4(3)'s contributory negligence rule barred an action by fiberglass manufacturing workers against their employer for injuries "synergistically" brought on by contact with asbestos at work and their cigarette smoking. Id. The Circuit held that "the statutory focus is not . . . merely on [the plaintiffs'] use of the product per se; instead, the statute requires the focus to be on whether [the plaintiffs] failed to exercise reasonable care under the circumstances in their use of the product." Id. at 722. Here, however, Plaintiff never used TASER's product. No case has extended Section 99B-4(3) to such a situation. Nicholson, 476 S.E.2d at 679-680. Therefore, TASER's motion must be **DENIED** on this issue.

Finding contributory negligence in this circumstance would immunize TASER from ever being liable for a product defect. Police officers do not deploy a taser unless a suspect has acted at least unreasonably. Therefore, a person who has been tased would always be barred by contributory negligence from suing TASER. This Court will not create such an immunity absent clear North Carolina precedent extending contributory negligence to products liability cases where the plaintiff never used the product in question.

TASER cited Hinton v. City of Raleigh, 264 S.E.2d 777, 779 (N.C. Ct. App. 1980), Benton v. Hillcrest Foods, Inc., 524 S.E.2d 53, 58 (N.C. Ct. App. 1999), Braswell v. N.C. A&T Univ., 168 S.E.2d 24, 30 (N.C. Ct. App. 1969), Sawyer v. Food Lion, Inc., 549 S.E.2d 867, 870 (N.C. Ct. App. 2001), and Lashlee v. White Consol. Indus., Inc., 548 S.E.2d 821, 827 (N.C. Ct. App. 2001) to support its argument. (Doc. No. 141 at 24-25). The first four of these cases were not product liability suits and cannot shed light on the meaning of Section 99B-4(3). The plaintiff in Lashlee fell from a tree while using the defendant's chainsaw. The court found that his failure to tie himself to the tree was contributorily negligent as a matter of law. 548 S.E.2d at 827. However, Lashlee differs from this case in that the plaintiff used the defendant's chainsaw

10

before being injured.

TASER filed six motions to provide supplemental authority on the issue of whether North Carolina law would apply contributory negligence in this case. Only one of these cases involved North Carolina law: Muteff v. Invacare Corp., 721 S.E.2d 379 (N.C. Ct. App. 2012). In Muteff, the defendant alleged that the plaintiff negligently plugged the defendant's electric wheelchair into a wall for re-charging, leading to a fire that caused her injuries. Thus, this case also fails to establish that a plaintiff who does not use a defendant's product can be barred by contributory negligence.

Even if North Carolina law applied the contributory negligence bar to a plaintiff who never used an allegedly defective product, TASER did not have a right to present the defense. As a matter of law, Plaintiff's alleged contributory negligence was not a proximate cause of his own death. No reasonable juror could believe that Plaintiff had reason to expect the officer to deploy a defective and lethal taser against him. Therefore, even if contributory negligence were otherwise available in a case where the plaintiff did not use the product, TASER was not entitled to argue the defense to the jury. TASER's motion must be **DENIED** on this issue.

2. Causation

TASER moves the Court to overturn the jury's verdict due to a failure of proof on causation. (Doc. No. 141 at 21). TASER contends that Plaintiff's only theory of causation was the extended 37-second exposure that Officer Dawson used on Turner. (Id.) (citing 7/13 Tr. at 667). But Plaintiff's causation theory at trial was that any duration of tasing would have resulted in Turner's death due to the location the probes hit him. See, e.g., (7/13 Tr. at 517, 547, 551-52). TASER points out that Plaintiff's expert, Dr. Zipes, admitted on cross-examination that he could

11

not "state one way or another" whether Turner would have gone into cardiac arrest with only a five second application of TASER's ECD. However, this single statement does not erase Dr. Zipes's detailed testimony describing how TASER's product could have caused Turner's death after any duration of electric shock. See (7/12 Tr. at 480-482; 7/13 Tr. at 515-588). For instance, Dr. Zipes also testified that TASER's ECD captured a pig's heart rate in 24 of 25 five-second shock tests where the probes hit the animal's chest. (7/13 Tr. at 554).

TASER argues that only a test on humans could be used to determine whether their product could cause VF. (Doc. No. 141 at 20-21). Plaintiff pointed out the absurdity of insisting on potentially fatal tests on human beings. (Doc. No. 150 at 15). Plaintiff showed that animal studies have regularly been used to determine how something might affect human beings. See (Doc. No. 150 at 14-15). Further, Plaintiff presented a study of a man with a pacemaker who was tased twice; each application lasted five seconds. (7/13 Tr. at 571-72). When his pacemaker was examined, it showed that his heart rate had been captured during these applications. (Id.). TASER's expert, Dr. Gary Michael Vilke, agreed that this study showed TASER's product causing capture of the man's heart rate. (7/18 Tr. at 1332-35). For further human case studies, TASER need look no further than the unfortunate facts surrounding Turner's death. See Wilson v. City of Lafayette, Nos. 07-cv-1844, 07-cv-2248, 2010 WL 1291518, at *4 (D. Colo. Mar. 29, 2010) (holding that the jury may properly consider what happened to the plaintiff upon the discharge of TASER's ECD in its causation analysis).

After listening to Plaintiff's and TASER's causation experts, the jury decided that TASER's product, used as directed, caused Turner's death. This Court will not displace that factual finding. There was substantial evidence before the jury to support its finding of both general and specific causation. Therefore, TASER's motion must be **DENIED** on this issue.

12

3. Failure to Warn

TASER argues that Plaintiff failed to show that TASER should have known of the inadequacy of its warnings at the time of sale or at least by the time of Turner's death. (Doc. No. 141 at 35). But Dr. Zipes detailed several studies that were available to TASER before March 20, 2008. (7/13 Tr. at 515-528). Further, Plaintiff showed that despite studies showing the danger of shots to the chest, TASER's training materials continued to teach officers to aim for the "center of mass" and depicted chest shots as examples. (7/12 Tr. at 262-65). Officer Dawson even remembered being taught to aim for the chest during training. (7/11 Tr. at 15). Officer Dawson also agreed with Plaintiff's counsel that he was told that a shot to an experimental animal's chest was safe. (Id. at 20). As this Court ruled in its summary judgment order, "a reasonable jury could conclude that a different warning would have resulted in a different outcome." See (Doc. No. 87 at 13). Plaintiff presented substantial evidence that TASER's warning was inadequate and that its failure to provide a reasonable warning was an actual and proximate cause of Turner's death. Therefore, TASER's motion must be **DENIED** on this issue.

B. Rule 59(a) New Trial

TASER moves for a new trial under Rule 59(a), or, in the alternative, for a remittitur of the jury's verdict. "On a Rule 59(a) motion, a district court may set aside the jury's verdict and grant a new trial only if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice even though there may be substantial evidence which would prevent the direction of a verdict.'" Attard Indus., Inc. v. U.S. Fire Ins. Co., No. 1:10-cv-121, 2010 WL 4670704, at *2 (E.D. Va. Nov. 9, 2010) (quoting Atlas Food Sys., 99 F.3d at 594). In considering a Rule 59 motion, "courts may make credibility

13

judgments in determining the clear weight of the evidence." Id. (citing Knussman, 272 F.3d at 647).

TASER argues that "the jury verdict stems from an incomplete and inaccurate view of the law, liability evidence, and damages evidence that deprived TASER of a fair trial" and a new trial should, therefore, be ordered. (Doc. No. 141 at 36). TASER objects to the Court's rulings regarding 1) Turner's possession of marijuana and commission of crimes, 2) expert testimony and 3) Plaintiff's lawsuit against CMPD.

### 1. Evidence of Marijuana and Commission of Crimes

TASER contends that this Court should not have allowed Turner to be portrayed at trial as "a model young man who had never done anything wrong." (Doc. No. 141 at 37). TASER argues that the Court's exclusion of the drug and crime evidence which TASER sought to introduce unfairly enhanced the damages award. (Id.).

Plaintiff moved to exclude evidence of three small bags of marijuana, each containing approximately one gram, found in Plaintiff's sock at the hospital. (Doc. Nos. 102; 104). In response, TASER urged the Court to allow the evidence, arguing that it was relevant to the cause of death, contributory negligence and damages. (Doc. No. 107 at 3). The Court disagreed, however, finding that "[t]here is no medical evidence that the [decedent] was acting under the influence of marijuana. The mere presence of marijuana in the sock is not relevant to any issue in the case, and is otherwise excludable under Rule 403 considerations." (7/11 Tr. at 7-8). First, the marijuana evidence was not relevant to Turner's cause of death because TASER did not proffer any medical evidence indicating that Turner was under the influence of marijuana and the toxicology screen conducted by the medical examiner did not test for THC, the chemical found in marijuana. Second, the evidence could not be offered as relevant to contributory

14

negligence because the Court excluded the defense of contributory negligence. Finally, with regard to damages, the Court finds that the evidence of Turner's possession of marijuana is relevant to damages, but that its "probative value is substantially outweighed by a danger of . . . unfair prejudice." FED. R. EVID. 403.

Plaintiff also moved to exclude evidence pertaining to "the crimes that Darryl Turner may have committed during the subject incident as well as the crimes he may have been charged with had he survived his encounter with Officer Dawson." (Doc. No. 103 at 1). TASER argues that "Turner's criminal behavior materially bears not just on his contributory negligence, but on damages awardable under the wrongful death statute." (Doc. No. 107 at 8). TASER asserts that on the day of his death, Turner "had committed no fewer than six crimes" and contends this evidence should have been allowed. The Court excluded the testimony of former Assistant District Attorney Steve Ward with respect to possible legal charges that could have resulted from Turner's conduct if he had not died. (7/11 Tr. at 8). The Court found that such testimony "is not relevant to any issues in the case and is otherwise excludable under Rule 403." (Id.).

The jury was not kept in the dark about the events leading up to Turner's death. In TASER's opening statement, the jury heard that Food Lion's Service Manager, Mary Blackert, told Turner to tuck his shirt in and get himself together. (7/11 Tr. at 70). Turner responds by "throw[ing] profanities at her, including the F. word." (Id.). Blackert tells Turner "you need to leave the store" but Turner "continues the confrontation with her." (Id.). Then, Turner "starts talking on the PA system." (Id.). At this point, Blackert calls 911 because "[s]he's scared of what's going on here. This is a public place. There's customers, women, children, elderly, moms, dads, it's the grocery store." (Id.). Turner, refusing to leave, is terminated for insubordination. (Id. at 71). "So he takes his shirt off and then . . . walks back to the break room

15

and he's waiting for the manager to come." (Id.). When the manager, Antwan Wesley, arrives, Turner pushes a Western Union display toward Wesley. (Id.). Then, he throws an umbrella. (Id.). "Now this was not just some toss of an umbrella into the corner. The video will show you that he now . . . throws an umbrella . . . at the store manager. And the officer sees this." (Id.). As the officer tases Turner, Turner "actually picks up one of these racks that we've all seen at the end of the counter . . . and throws it." (Id.).

TASER also played surveillance video footage of the events for the jury over and over again, and from every conceivable angle, to supplement its verbal account of the events. Additionally, TASER called several witnesses, including Wesley, to recount the same to the jury. In light of the substantial evidence of Turner's misbehavior on the day of his death, the additional proffered testimony of a former district attorney that just prior to his death Turner "committed no fewer than six crimes," (Doc. No. 141 at 37), is speculative, irrelevant, misleading, and needlessly cumulative. FED. R. EVID. 403.

        2.     Expert Testimony

TASER contends that the Court erred in excluding certain experts from testifying and allowing others. First, TASER's argument regarding the exclusion of its proffered marijuana expert is misplaced. TASER argues that "[f]ailing to allow TASER to present expert medical opinion that there was a reasonable basis to suspect Turner was under the influence of marijuana . . . rendered the jury verdict substantially unreliable." (Doc. No. 141 at 37). In its response to Plaintiff's motion in limine, TASER stated that it "ha[d] not listed Dr. Ronald Siegel as a witness in its exchanged final trial disclosures and has no intention of calling him to the stand . . ." (Doc. No. 107 at 3). As TASER, by its own admission, had no intention of calling Siegel to the stand, it cannot now argue that a trial without him would be unjust.

16

Next, TASER argues that the Court erred in excluding testimony from Taser's proposed expert witness on warnings, Stephen Young. TASER states that "[t]he jury lacked the benefit of human factors and engineering psychology that undergirds the propriety of warnings, particularly with respect to complex law enforcement tools such as an ECD." (Doc. No. 141 at 37). During the pretrial conference, this Court granted TASER's motion to exclude Plaintiff's warning expert under Rule 403 as cumulative and confusing. (Doc. No. 93 at 7; 8). The Court then ruled that the same bar would apply to TASER's expert. (Id.). TASER now argues that their expert witness should have been allowed to testify, but that Plaintiff's expert witness was rightly excluded. TASER's argument is denied.

TASER also contends that the Court improperly excluded testimony from John Combs, "a highly qualified use of force and law enforcement training expert." (Doc. No. 141 at 37). TASER attempted to differentiate Combs from Stephen Young as an expert witness on warnings stating that "[t]his is a police officer who trains. And he will say that the facts and circumstances that he's reviewed, applying those to the training and instructions from Taser, that this officer did not follow what Taser provided." (7/15 Tr. at 990). The Court previously excluded the testimony based on a Rule 403 analysis. (Id.). In reviewing the record, the Court finds no error in its previous ruling. TASER did not proffer any testimony from Combs indicating that Officer Dawson firing the ECD into Turner's chest was contrary to TASER's instructions. (Doc. No. 43-5 at 3). Combs's proffered opinion was only that Officer Dawson's 37-second application constituted misuse. (Id.). Because Combs failed to address Plaintiff's primary causation theory, he would have confused the issues and wasted the jury's time. The Court properly excluded Combs under Rule 403.

TASER next objects to introduction of expert testimony by Dr. Douglas Zipes stating:

17

> Permitting Zipes to testify when he admits he is not an expert on the flow of electrical current from an external source such as an ECD left the jury with the mistaken impression that he was a qualified expert.

(Doc. No 141 at 37; 38). The Court previously ruled on this matter in response to TASER's Motion in Limine to exclude Dr. Zipes' causation opinion. (Doc. No. 87). There, the Court found "that a jury – relying upon the expert testimony of Dr. Zipes that has survived TASER's rule 702 challenge . . . – could conclude . . . that the ECD used in this case did constitute a proximate cause of Turner's death as a matter of specific causation." (Doc. No. 87 at 17). The Court also listed Dr. Zipes' numerous qualifications, and after weighing the factors set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993), found that Dr. Zipes was qualified to provide expert testimony regarding causation. (Doc. No 87 at 16). The Court finds that there was no error in accepting Dr. Zipes' expert testimony.

TASER's final argument with regard to expert testimony is that the Court erred in permitting expert testimony by Dr. Barry Maron, in which Dr. Maron interpreted histologic tissue slides "when he is not a pathologist or cardiovascular pathologist, or ever worked on the subject of HCM without a cardiovascular pathologist." (Doc. No 141 at 38). The Court previously ruled on this matter during the pretrial conference. (Doc. No. 93 at 8). There, this Court ruled that "based on his background, training, and experience" Dr. Maron was qualified under Rule 702 to offer expert testimony. (Id.). TASER offers no new argument with regard to Dr. Maron but merely rehashes what it perceives as Dr. Maron's lack of qualified credentials. Accordingly, the Court finds no error in its previous ruling on Dr. Maron's expertise.

### 3. Plaintiff's Lawsuit Against CMPD

TASER argues that the Court should not have excluded proffered "evidence that CMPD [] viewed its officer as having misused the ECD by conducting an extended duration application

against department policy built on TASER's materials." (Doc. No. 141 at 37). "Indeed," TASER states, "the jury did not hear about Plaintiff's prior intent to sue Officer Dawson and CMPD, leaving it under the mistaken impression that only TASER stood alone as a possible source of blame for Turner's death." (Id.). When TASER proffered a redacted version of Plaintiff's settlement agreement with the City of Charlotte, it argued that "[t]he relevance is, there's a statement made and signed by the plaintiff, that the estate intends to pursue civil action against Officer Dawson, the CMPD and the City of Charlotte, which goes to, in this case now, blaming Taser for the situation by having signed as administratix a document declaring intent to pursue Officer Dawson." (7/18 Tr. at 1180). The Court excluded the exhibit on 403 grounds. (Id.). After re-examining the issue, the Court maintains that whatever relevance the proffered exhibit would have had, the probative value would have been substantially outweighed by a danger of confusing the issues, misleading the jury and wasting time. FED. R. EVID. 403. TASER's argument is **DENIED**.

        4.    Jury Instructions

TASER contends that the jury instructions were not appropriately limited against lost income and pain and suffering. (Doc. No. 141 at 36). The Court instructed the jury that it could consider medical care, funeral expenses, and the present monetary value of Turner to his parents in determining damages. (7/17 Tr. at 1453). The Court further explained that Turner's monetary value to his parents included the "services, protection, care and assistance, . . . society, companionship, comfort, guidance, kindly offices, and advice" he provided them, as well as the relationship he had with each parent. (Id. at 1454). TASER did not submit a proposed instruction to specifically warn the jury that their award was not to include lost income or pain and suffering. (Doc. No. 121). Nor did TASER object to the Court's damages instruction in the

19

charge conference or after the Court instructed the jury. (7/18 Tr. at 1165-71; 1462). Further, Plaintiff did not argue lost income or pain and suffering in its closing argument. (7/18 Tr. at 1399-1404). The Court finds no clear error in its instructions on damages.

For the same reasons set forth above with respect to TASER's Rule 50(b) JNOV motion, and considering the credibility of the witnesses, TASER has not shown that the verdict is against the clear weight of the evidence, is based on false evidence, or will result in a miscarriage of justice. Thus, the Court will not grant a new trial. The Court will, however, grant TASER's motion for remittitur because the jury's award was excessive. See Bennett, 432 F. Supp.2d at 602.

The Court's finding that the jury award was excessive does not require a new trial. The "Fourth Circuit has held that, to receive a new trial on liability and damages, the jury verdict must be made excessive by 'passion and prejudice springing from indulgence, in the jury room, in such feelings, [that] may not be cured by a remittitur, but only a new trial.'" Bennett, 432 F. Supp. 2d at 602 (quoting Ford Motor Co. v. Mahone, 205 F.2d 267, 273 (4th Cir. 1953), superseded by statute on other grounds as recognized by Carey v. Foster, 345 F.2d 772, 775 (4th Cir. 1965)). "[T]he sheer size of a jury award does not, by itself, demonstrate that it was the result of passion or prejudice." Id. at 604.

Here, with the exception of its own conclusory assertions, TASER has presented no evidence that the verdict was solely the result of the jury's passion or prejudice. "[W]ithout additional evidence of passion and prejudice by the jury, an excessive verdict alone is insufficient to require a new trial." Id. at 603. Nor are the issues of liability and damages so interconnected as to prevent a fair determination of damages apart from evidence of liability. The Court finds that the jury's verdict as to liability was reasonable, as stated above, and the

jury's damages award can be fairly addressed by an order of remittitur.

C.      Remittitur

"[A] remittitur, used in connection with Federal Rule of Civil Procedure 59(a), is the established method by which a trial judge can review a jury award for excessiveness." Atlas Food Sys., 99 F.3d at 593 (4th Cir. 1996). Remittitur is a process "by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." Id. "Indeed, if a court finds that a jury award is excessive, it is the court's duty to require a remittitur or order a new trial." Id. (citing Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 65-66 (1966)). In deciding whether a jury's award is excessive, a federal court sitting in diversity looks to substantive state law. See Stebbins v. Clark, 5 F. App'x 196, 201 (4th Cir. 2001).

In North Carolina wrongful death actions, damages are available for medical expenses, the decedent's pain and suffering, funeral expenses, the present monetary value of the decedent to his beneficiaries, punitive damages and nominal damages. See N.C. GEN. STAT. § 28A-18-2(b). Here, Turner's pain and suffering and punitive damages were not at issue. See (Doc. No. 87 at 23) (dismissing punitive damages claim); (7/18 Tr. at 1169, lines 5-8) (removing pain and suffering by agreement). Beyond modest funeral and medical expenses,[8] this case concerned primarily pecuniary damages under N.C. GEN. STAT. § 28A-18-2(b)(4):

> (4)  The present monetary value of the decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected;

_____

[8] The parties stipulated to $5,211.52 in medical expenses and $5,632 in funeral expenses. See (7/18 Tr. at 1169).

21

> [. . .]⁹
> b. Services, protection, care and assistance of the decedent, whether
> voluntary or obligatory, to the persons entitled to the damages recovered,
> c. Society, companionship, comfort, guidance, kindly offices and advice
> of the decedent to the persons entitled to the damages recovered.

N.C. Gen. Stat. § 28A-18-2(b)(4).

The Supreme Court of North Carolina discussed the difficulty of ascertaining an exact

damages amount under paragraph (4):

> No rule is prescribed for the measurement or ascertainment of the damages
> recoverable under paragraph (4). It would be difficult, if not impossible, to
> formulate a rule of general application for the measurement of such damages.
> Recovery for these items will vary from case to case according to the age of the
> deceased and the age of the person entitled to receive the damages recovered and
> their relationship with the deceased. Since the persons entitled to the damages
> recovered may have suffered substantial losses on account of these items of
> damage, we cannot say there can be no recovery for these items of damages
> because no yardstick for ascertaining the amount thereof has been provided.
> Damages recoverable under paragraph (4) would be as capable of exact
> ascertainment as damages for pain and suffering and mental anguish in a personal
> injury action. In recent years, '(i)t has been recognized that even pecuniary loss
> may extend beyond mere contributions of food, shelter, money or property; and
> there is now a decided tendency to find that the society, care and attention of the
> deceased are 'services' to the survivor with a financial value, which may be
> compensated.' Prosser, Law of Torts 127, p. 908 (4th ed. 1971).

Bowen v. Constructors Equip. Rental Co., 196 S.E.2d 789, 805-06 (N.C. 1973). Despite this

difficulty, North Carolina courts agree that "[t]he first step to determine the damages recoverable

under paragraph (4) is to identify the particular persons who are entitled to receive the damages

recovered." Bowen, 196 S.E.2d at 805. Turner died unmarried and childless so his beneficiaries

under the wrongful death statute were his parents. See N.C. Gen. Stat. § 29-15(3) (2011);

Stutts v. Adair, 380 S.E.2d 411, 415 (N.C. Ct. App. 1989). In ascertaining the amount of

---

⁹ Plaintiff did not seek damages under (4)(a) "Net income of the decedent." (7/14 Tr. at
720, lines 21-25).

22

damages recoverable under section (b)(4), only the losses suffered by those who are going to share in the recovery may be taken into account. See Carver v. Carver, 314 S.E.2d 739, 747 (N.C. 1984).

In Bowen v. Constructors Equip. Rental Co., 196 S.E.2d at 789, the decedent was also 17 years old. The North Carolina Supreme Court noted:

> In the present factual situation, Howard may have made no financial contribution to the support of his parents during their active years. It may be that the persons who would receive his net income if he had survived would be a wife and a child or children. During his years in college, and during the earlier years of his career and possible marriage, it may be more likely that financial aid would flow from his parents to Howard rather than from Howard to his parents. Even so, the loss of a son may be a grievous loss and substantially deprive the parents of services such as those described in subparagraphs [(b)] and [(c)] of paragraph (4).

Bowen, 196 S.E.2d at 806. Here, Turner's parents testified extensively about the services, care, assistance, society, companionship, comfort, guidance, kindly offices and advice, see N.C. GEN. STAT. § 28A-18-2(b)(4), that Turner provided to them.

Turner's mother testified that she worked at night so, five nights per week, Turner babysat his four younger siblings. (7/14 Tr. at 871-72). In that capacity, Turner got up with the children in the morning, made them breakfast, played with them and provided them with love and, if necessary, discipline. (Id. at 871, lines 17-24). Turner's mother also testified that Turner kept the kitchen and living room clean and vacuumed. (Id. at 872, lines 22-23). Turner also ran errands for her. (Id. at 883, lines 13-14).

Turner assisted his mother when she suffered from diabetic episodes that prevented her from performing normal activities. (Id. at 874-75). Turner's mother testified that he did nice things for her, like baking a cake for her on Mother's Day and on her birthday. (Id. at 876, lines 8-13). She also testified to the countless happy times she shared with her son, describing events

23

portrayed in pictures and recalling various memories of Turner's baptism, birthdays and graduations. (Id. at 875-81). Turner's mother stated that she "felt very proud and honored" when she watched him graduate high school at age 16. (Id. at 881, lines 4-6). She described Turner as "very bright" and informed the jury that he graduated first in his class. (Id. at 882, lines 12-16). Turner, she explained, was eager to attend college and wanted to go to UNC Charlotte, although he was turned down. (Id. at 882-83). She also discussed his aspirations of going into sports medicine, and explained how she encouraged him to attend college and become a sports trainer. (Id. at 883, lines 3-8).

Turner's mother also testified about how difficult it was losing her son.[10]  Turner's mother recalled that on the day of his death, Turner was going back to Food Lion and she told him that she loved him, and he told her that he loved her. (Id. at 884-885). When she learned of her son's death, Turner's mother testified "I tried to stand up and I fell down." (Id. at 886, line 18). Turner's mother also testified about how emotionally difficult it has been for her in the years since her son's death. (Id. at 891, lines 4-12) (On Turner's last birthday, his mother had to go to Food Lion. She stated: "I started thinking about my baby. And by the time I got to the register, I was crying. But then I got outside, I just kind of broke down. . . . And I just kept crying and crying."); (Id. at 891-922) (On the second anniversary of Turner's death, his mother was at church for her children's baptism and testified: "I was just missing him so much, and so I walked away and I started crying. And one of the members she came out and she just hugged me and I just started sobbing . . .").

_____

[10] The Court notes that while Turner's mother's grief over losing her son is not directly relevant to the damages assessment, it is some indication that Turner's presence in his mother's life was valuable.

24

Turner's father testified about the significant role Turner had in his life and of the devastating impact of his death. Turner lived with his father for a year when he was 15 and 16 years old. (7/14 Tr. at 861-62). During this time, Turner and his father "did a lot of activities together. Sports, fishing, football games, basketball games. [They] played basketball together, that type of thing." (Id. at 862, lines 4-6). They also worked out together. (Id. at lines 8-9). Turner's father testified that he was proud of Turner when he graduated from high school at age 16. (Id. at 863, lines 9-10). He also discussed Turner's motivation to become employed, explaining that Turner started looking for employment at age 15, but "was too young to be employed because of his age." (Id. at lines 15-16). His father also testified regarding Turner's college applications and his aspirations of becoming a personal trainer. (Id. at 864).

Turner's father testified that it was difficult to function after his son's death. (Id. at 866, lines 13-15) ("[I]t was just hard to get up and just do anything. I mean, even just to take a shower. To do chores around the house, to go to work, to do anything."). He also had difficulty concentrating at work, which caused his relationship with his employer to suffer. (Id. at lines 21-24); see also (id. at 867, line 1) ("I ended up losing my job. I ended up resigning."). Turner's father further testified that for the two years following his son's death, he slept two to three hours per night. (Id. at lines 15-21). Turner's mother testified that, growing up, Turner's father was his "hero." (Id. at 869, line 12).

Turner's grandmother's testimony corroborated the testimony of his parents. His grandmother testified that Turner did household chores for his mother while she was at work. (Id. at 686). She also stated that Turner cooked for his siblings, and "would try to have the dishes and things washed by the time his mom came home." (Id. at lines 17-18). Turner's grandmother also testified that Turner planned to attend Central Piedmont Community College

25

"to become a personal trainer so that he could work his way up and become - and go into sports medicine."[11] (Id. at 690, lines 2-3).

Others testified to Turner's good character which, while not directly indicative of the value of the services Turner provided to his parents, indicates that Turner likely would have offered valuable companionship, assistance and comfort. Turner's girlfriend testified that he was "very outgoing and fun to be around." (7/13 Tr. at 701, line 23). Turner also made an impression on those with whom he came into contact at work. His mother testified that a lot of the people from the retirement home close to the Food Lion came to his funeral because they knew Turner from Food Lion and found him to be "friendly," "a good child and very respectful" and "they just liked Darryl." (Id. at 889, lines 15-25).

The Bowen court indicates that this Court should consider how close Turner was to his beneficiaries in evaluating damages:

> If the persons entitled to the damages recovered were collateral relatives whose contacts with the decedent were casual and infrequent, there may be no basis for the recovery of any significant amount under paragraph (4).

Bowen, 196 S.E.2d at 806. TASER argues that Turner was not close with his parents, stating:

> Evidence supporting damages was modest. Turner lived with his grandparents rather than either of his divorced parents. He occasionally stayed with his father. He periodically assisted his mother.

(Doc. No. 141 at 12). The evidence presented at trial, however, painted a different picture. Turner's grandparents lived next door to his mother and Turner frequently went between the two homes, babysitting five nights per week for his younger siblings at his mother's house and

---

[11] The Court notes that while Turner's aspirations are not directly relevant to an evaluation of the value of his services to his parents, they are some indication of the type of person he was and the level of "protection, care, assistance, society, companionship, [and] comfort" that he might have provided to his parents. N.C. GEN. STAT. § 28A-18-2(b)(4).

staying at his grandparents' house on the other nights. Contrary to TASER's assertion that Turner "occasionally" stayed with his father, Turner lived with his father for a year when he was 15 and 16 years old. Turner's "periodic" assistance to his mother included extensive babysitting services, running errands, and providing invaluable assistance during her diabetic episodes. As demonstrated by the trial testimony, Turner enjoyed a close familial relationship with his parents which could be the basis for the recovery of a significant amount.

    1.  The Jury's Analysis of North Carolina Case Law

  TASER argues that the jury ignored substantive North Carolina law prescribing the analysis for N.C. GEN. STAT. § 28A-18-2(b). This argument fails for two reasons. First, it is not the jury's role to interpret case law. Second, the cases that TASER cites are not contrary to the jury's verdict.

    a.  <u>Bowen v. Constructors Equip. Rental Co.</u>

  First, TASER implies that the <u>Bowen</u> court affirmed the grant of a new trial and set aside a $115,000 verdict because it was excessive. In fact, the North Carolina Supreme Court set aside the verdict because it found that the jury was improperly instructed to consider the life expectancy of the decedent, rather than that of the decedent's beneficiaries, in determining damages. <u>See</u> <u>Bowen</u>, 196 S.E.2d at 789.

  TASER also cites <u>Bowen</u> in support of an irrelevant argument pertaining to lost income. As TASER is aware, lost net income is not at issue here. (Doc. No. 141 at 16) ("Punitive damages were out. Lost income was not at issue. Pain and suffering damages were not sought or in play."). However, TASER cites portions of <u>Bowen</u> pertaining to lost net income, and repeatedly emphasizes in its briefing that lost net income may only be recovered by parental beneficiaries with "reasonable expectations" of receiving such assistance. As lost net income is

27

not at issue here, this argument is irrelevant.

TASER further cites <u>Bowen</u> for the proposition that "'casual and infrequent' contacts might mean that there was 'no basis for the recovery of any significant amount.'" (Doc. No. 141 at 17) (quoting <u>Bowen</u>, 196 S.E.2d at 806).  As explained above, Turner's contacts with his parents can hardly be considered "casual and infrequent."  The Court finds TASER's assertions regarding <u>Bowen</u> inapposite to the present case.

b.    <u>Pearce v. Fletcher</u>

TASER also places great weight on <u>Pearce v. Fletcher</u>, 328 S.E.2d 889 (N.C. Ct. App. 1985), in which the jury awarded $5,000 for the wrongful death of a 19-year-old who had stopped attending school, worked periodically as a waitress, lived at home and had a history of significant substance abuse.  TASER argues that <u>Pearce</u> indicates that the jury failed to properly value Turner's life.  (Doc. No. 141 at 17).  <u>Pearce</u>, however, is factually distinguishable from the present case and also supports the proposition that the jury's assessment of a decedent's "worth" should be given deference.  In <u>Pearce</u>, the defendant was driving while intoxicated when his car overturned, causing the decedent passenger's death.  The North Carolina Court of Appeals affirmed the jury's $5,000 damages award, stating:

> The evidence regarding decedent's low level of educational attainment, absence of regular employment, status of dependency, and history of alcohol and drug abuse was clearly relevant to a determination of her "present monetary value ... to the persons entitled to receive the damages recovered."  G.S. 28A-18-2(c).  The jury could conclude that these negative factors offset, to the extent found, what decedent's present monetary value would have been in their absence.  Our Supreme Court noted in <u>Worthington</u> that "trial judges ... have traditionally exercised their discretionary power to grant a new trial in civil cases quite sparingly in proper deference to the finality and sanctity of the jury's findings."  <u>Worthington</u>, 290 S.E.2d at 605.  In light of the evidence here, we cannot conclude that the trial court's decision to defer to the finality and sanctity of the jury's findings was a manifest abuse of discretion or probably amounted to a substantial miscarriage of justice.  We thus affirm the ruling.

28

<u>Pearce</u>, 328 S.E.2d at 890-91 (citing <u>Worthington v. Bynum</u>, 290 S.E.2d 599, 602 (N.C. 1982)).

It is in the jury's discretion to determine a decedent's worth to his beneficiaries. Here, the jury heard the evidence, assessed the credibility of the witnesses, and apparently determined that Turner was not similar to the decedent in <u>Pearce</u>. Contrary to TASER's contention that Turner's life "had turned down a bad path on March 20, 2008," (Doc. No. 141 at 17), Plaintiffs put on significant evidence of Turner's high worth. Indeed, Plaintiff called six witnesses to testify about Turner's habits, character and relations with his next of kin. TASER could have put on witnesses to testify about Turner's alleged low worth, or cross examined Plaintiff's witnesses to elicit contrary evidence, but chose not to.

During the trial, Turner was portrayed as a "very promising" 17-year-old who graduated first in his high school class at age 16, was a model Food Lion employee, aspired to attend college, and babysat his much younger siblings five nights per week while his mother worked evenings. Turner was described as dependable, trustworthy, outgoing and friendly. Based on this evidence, the jury could have found great worth to Turner's life and this Court will exercise the proper deference to the jury's evaluation.

        2.      Evidence supporting damages under N.C. Gen. Stat. § 28A-18-2(b)(4)

TASER argues that the evidence supporting damages under N.C. Gen. Stat. § 28A-18-2(b)(4) was insufficient to support the jury's verdict. The Court finds that, to some extent, TASER is correct on this point. The evidence as to damages was relatively thin. That being said, making the permitted credibility determinations, <u>Knussman</u>, 272 F.3d at 647, the Court finds that Turner's parents were credible witnesses on the issue of Turner's value to them. Turner's parents' testimony, corroborated by the testimony of his girlfriend, grandmother and Food Lion supervisor, established that Turner's life had significant worth and that his death

29

caused great loss to his parents.  The jury's $10 million damages award, however, was excessive.  For this reason, the Court will remit the verdict.

> 3.  Comparable Wrongful Death Compensatory Damages Awards

TASER's third argument is that North Carolina courts have not approved wrongful death compensatory damages exceeding $1.5 million under N.C. GEN. STAT. § 28A-18-2.  (Doc. No. 141 at 18-19) (citing Chaney v. Young, 468 S.E.2d 837, 840 (N.C. Ct. App. 1996) ($118,000); Cole v. Duke Power Co., 344 S.E.2d 130, 131-37 (N.C. Ct. App. 1986) ($1.5 million); Harris v. Scotland Neck Rescue Squad, Inc., 331 S.E.2d 695, 700-01 (N.C. Ct. App. 1985) ($323,000); Spillman v. Forsyth Mem. Hosp., 227 S.E.2d 292, 297 (N.C. Ct. App. 1976) ($75,000); Smith v. Kilburn, 196 S.E.2d 588, 590 (N.C. Ct. App. 1973) ($20,000); Bumgardner v. Allison, 78 S.E.2d 752, 756 (N.C. 1953) ($25,000); Smith v. Atlantic & Y. Ry. Co., 156 S.E. 508, 511-12 (N.C. 1931) ($21,000); Tyree v. Tudor, 111 S.E. 714, 717 (N.C. 1922) ($15,000)).  The most recent case that TASER cites, however, is 16 years old, and the oldest is 90 years old.  Further, as Plaintiff points out, these cases do not involve remittitur.  Instead, the courts in these cases respected the jury's verdicts and there is no indication that the same courts would not have affirmed substantially larger verdicts.  Contrary to TASER's assertion, North Carolina juries have handed down higher verdicts.  See, e.g., Murray v. Kennedy, No. 02cv792, 2003 WL 25600565 (N.C. Super. Ct. June 1, 2003) (awarding $3.5 million in wrongful death damages).  Additionally, the facts in each of the cited cases differ from those in the present case.  The Court finds TASER's cases only modestly helpful in the analysis of the excessiveness of this jury's award.

> 4.  Other Courts' Approval of Compensatory Damages Awards

Finally, TASER argues that other authority also indicates that a $10 million verdict is

grossly excessive.  See, e.g., Tingle v. Amer. Home Assur. Co., 40 So. 3d 1169, 1177 (La. Ct.

App. 2010) ($2 million for each parent in wrongful death of 2-year-old daughter excessive;

remitted to $700,000 for each parent); Moody v. Ford Motor Co., 506 F. Supp. 2d 823, 845-46

(N.D. Okla. 2007) ($15 million judgment excessive; new trial granted); Glabman v. De La Cruz,

954 So. 2d 60, 63 (Fla. Dist. Ct. App. 2007) ($8 million was excessive award to parents whose

teenage daughter died from complications from lupus, where award was based in part on father's

emotional testimony).  Plaintiff cites several cases with substantial verdicts to support the

opposite conclusion.[12]  See, e.g., Wackenhut Corrs. Corp. v. de la Rosa, 305 S.W.3d 594, 641-42

(Tex. Ct. App. 2009) (evidence was legally sufficient to support $10 million damages award for

past and future mental anguish and loss of companionship to deceased inmate's mother, in

wrongful death action); Rufo v. Simpson, 86 Cal. App. 4th 573 (Cal. Ct. App. 2001) (affirming

award of $8.5 million in compensatory damages to parents of Ronald Goldman for wrongful

death).

Indeed, the parties spend a significant portion of their briefing arguing over the holdings

of various cases from outside North Carolina.  The Court observes that each case, with distinct

facts and juries, provides only limited aid to the Court in assessing the excessiveness of the

jury's verdict under North Carolina law.

5.      Assessment of Damages

"The present monetary value of the decedent to the persons entitled to receive the

damages recovered will usually defy any precise mathematical computation."  Brown v. Moore,

---

[12] Most of the cases Plaintiff cites are state court, unpublished cases of which Plaintiff
fails to attach copies.  Plaintiff also "cites" several other cases by directing the Court to news
articles.  The Court will not take those cases which the Court was unable to locate into
consideration.

31

213 S.E.2d 342, 348 (N.C. 1975) (citing 22 Am. Jur. 2d Deaths § 267 (1965)). "Therefore, the assessment of damages must, to a large extent, be left to the good sense and fair judgment of the jury - subject, of course, to the discretionary power of the judge to set its verdict aside when, in his opinion, equity and justice so require." Id. at 348-49. Damages are never presumed; the plaintiff must satisfy the jury by the greater weight of the evidence of the existence of damages and of facts which will furnish some basis for a reasonable assessment. See Lieb v. Mayer, 94 S.E.2d 658, 660 (N.C. 1956); see also Stallworth v. Shuler, 777 F.2d 1431, 1435 (11th Cir. 2005) (stating that "compensable damage may not be presumed but must be proven"). "[T]he damages in any wrongful death action are to some extent uncertain and speculative. A jury may indulge in such speculation where it is necessary and there are sufficient facts to support speculation." Brown, 213 S.E.2d at 349. When juries make awards that are statutorily allowed, "the role of the trial judge is 'to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'" Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433 (2001) (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989). Whether a jury award is excessive is a question of law. Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 280 (4th Cir. 1999) (citing Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 438-39 (1996)).

The Court finds that there was sufficient evidence presented at trial for the jury to find that Turner's value to his parents was significant. The jury's $10 million damages award, however, was excessive even according to Plaintiff's own assessment. Plaintiff argued that the jury should consider each parent's loss equivalent to $1,000 or $2,000 per week for forty years. (7/18 Tr. at 1403-04). Plaintiff then took the $2,000 figure and argued that this would come out

32

to $2 to $4 million per parent and requested a verdict somewhere between $4 and $8 million total. (Id.). But Plaintiff did not suggest how the jury might discount this total lifetime loss to present value. The jury's verdict suggests that it did not reduce its figure to present value.

The damages are to be reduced to the highest amount the jury could have properly awarded. Vanwyk Textile Sys. v. Zimmer Mach. America, Inc., 994 F. Supp. 350, 358 (W.D.N.C. 1997) (citing Dagnello v. Long Island R.R. Co., 289 F.2d 797 (2d Cir. 1961)) ("[R]eduction only to the highest amount that the jury could properly have awarded . . . is the only theory that has any reasonable claim of being consistent with the Seventh Amendment."). In so reducing the jury's verdict, the Court has kept in mind "proper deference to the finality and sanctity of the jury's findings." See Worthington v. Bynum, 290 S.E.2d 599, 602 (N.C. 1982). The Court also appreciates that any measure of the worth of a human being is incapable of mathematical precision and can only ever be an approximation based on the evidence.

The Court finds that the jury was clearly convinced of Plaintiff's case and believed Turner to be worth a substantial amount to his parents. Therefore, the Court finds that a figure toward the high end of Plaintiff's estimation is appropriate and uses $7.5 million as its estimate of the highest value the jury could have determined Turner to be worth to his parents over their projected final forty years. See Pine Ridge Coal Co. v. Local 8377, United Mine Workers of America, 187 F.3d 415, 421 (4th Cir. 1999) ("Once a party has established the fact of damages, the court may estimate damages based on just and reasonable inferences drawn from the evidence submitted."); see also Stallworth, 777 F.2d at 1435 ("Once liability has been found, the district court has a great deal of discretion in deciding the level of damages to be awarded").

This amount must be reduced to its present value. As far back as 1912, the North Carolina Supreme Court cautioned that "no special formula has yet been prescribed as alike

33

applicable to all cases and as one that should be used in trials." Ward v. North Carolina, 76 S.E.717, 720 (N.C. 1912). Therefore, the Court's present value calculation is only one illustration of how a reasonable jury could have reduced its estimation of Turner's parents' loss to present value.

Plaintiff has argued for a one percent discount value in its post-trial briefing. (Doc. No. 149 at 7). This is a very optimistic, defense-friendly discount rate as the United States Treasury's current thirty-year constant maturity rate is only 3.38 percent while inflation is expected to approach 3 percent, leading to a 0.38% real interest rate.[13] Using this discount rate to reduce a forty-year annuity[14] to its present value, yields a $6,156,503.65 award.

Plaintiff has already received $625,000, (Doc. No. 45-3 at 3),[15] from its settlement with the City of Charlotte and $40,000[16] from Food Lion's workers compensation award. North Carolina law provides that these amounts diminish Plaintiff's claim against TASER. Ryals v. Hall-Lane Moving and Storage Co., Inc., 468 S.E.2d 69, 74 (N.C. Ct. App. 1996). Therefore, the

---

[13] Sherman, Austen & Keene, Tom, Inflation in U.S. May Rise 3% This Year, Barclay's Pond Says, Bloomberg Businessweek, http://www.businessweek.com/news/2012-03-19/inflation-in-u-dot-s-dot-may-rise-to-3-percent-this-year-barclays-pond-says, last visited March 22, 2012 (inflation); Daily Treasury Rates, U.S. Dep't of the Treasury, http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yield, last visited March 22, 2012 (treasury rates).

[14] The Court assumed Turner's value to his parents remained constant of the remainder of their lifetimes. Thus, the Court divided the $7,500,000 figure into forty equal annual payments of $187,500.

[15] As noted above, the Court excluded evidence of the settlement with the City of Charlotte on Federal Rule of Evidence 403 grounds. (7/18 Tr. at 1180).

[16] The Court apprised the jury of the $40,000 workers compensation award and told it that the Court would be required to deduct that amount from any damages they awarded Plaintiff. (7/18 Tr. at 1456-57).

Court will remit Plaintiff's verdict to **$5,491,503.65.**

## IV.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that TASER's Motion for Rule 50 JNOV, Rule 59 New Trial, or Remittitur, (Doc. No. 141), is **GRANTED in part and DENIED in part**.  The Court will **DENY** the portions of TASER's Motion seeking judgment notwithstanding the verdict and new trial, but will **GRANT** the portion of TASER's motion seeking remittitur.  The Court hereby remits the jury's verdict from $10 million to **$5,491,503.65**.  Plaintiff shall have **30 days** from the entry of this Order to either accept or reject the remitted damages award.  Should Plaintiff choose to reject the remittitur, the Court will order a new trial.  See Hetzel v. Prince William Cnty., 523 U.S. 208, 210 (1998) (ordering a remittitur without the option of a new trial violates a plaintiff's Seventh Amendment right to a jury trial).  Should Plaintiff accept the remitted damages award, judgment shall issue in the amount of **$5,491,503.65**.

Signed: April 20, 2012

Robert J. Conrad, Jr.
Chief United States District Judge